KILGOUR v. NEW YORK GUARANTY, ETC., CO. See Case No. 18,125.

---

## Case No. 7,765.

### KILLAM v. The ERI.

[3 Cliff. 456.] [1]

Circuit Court, D. Maine. Sept. Term, 1871.

COLLISION—LOOKOUT—LIGHTS—INEVITABLE ACCIDENT—PRACTICE IN ADMIRALTY—LIEN FOR TORT—WHERE COGNIZABLE — DEFENCE OF NEGLIGENCE.

1. Maritime liens are founded in commercial usage, and the proper remedy to enforce the same, whether arising from a marine tort or contract, is by a suit in rem commenced where the res is found.

2. Jurisdiction in rem is exclusive in the district courts. but the suit may be instituted in the district where the res is found, irrespective of where the injury for which satisfaction is sought occurred.

3. A general allegation of negligence in a collision case is. on the part of the libellant's vessel, not sufficient to constitute a valid defence even in pleading. Specification as to what was done or omitted and caused the accident must be made.

4. A vessel in the evening was lying-to on the starboard tack, with her helm hard a-port, with a competent lookout properly stationed. and with signal-lights fully displayed as required by law. Another vessel was discovered directly ahead. The order was given not to change the helm, and a collision took place. Held, that no negligence could be charged to those on board the vessel first named for not keeping her to her course.

5. Inevitable accident in cases of collision is where a disaster takes place. occasioned exclusively by natural causes. without any fault on the part of the owners or those intrusted with the management of either vessel.

6. Two vessels were lying-to just prior to a collision. which took place in the night.—one with competent lookout properly stationed. the required signal-lights. on the starboard tack, with helm hard a-port; the other had her red light burning brightly. Just before the collision the green light was burning, but not as brightly as it should have done. In the attempt by an officer to turn it up it went out. It was handed to a seaman. and was only seen on the starboard side by the master when the two vessels were close together. No person was specifically appointed or stationed as a lookout. All the crew were abaft of the mainmast just before the collision. A collision ensued. Held, not an inevitable accident, but that the vessel last referred to was in fault.

7. The rules of navigation require seasonable precautions to avoid danger in collision cases.

8. The ground upon which the vessel in fault in this case was clearly liable was the absence of an appointed and properly stationed lookout.
[Cited in The Ancon, Case No. 348.]

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

[Appeal from the district court of the United States for the district of Maine.]

Libel in rem [against Obed B. Boyce and others, claimants and appellants] in a cause of collision. Decree in the district court for libellant. Decree affirmed. Compensation was claimed by the libellant [Wentworth Killam] as master, in behalf of the owner of the brig Gilliat, on account of injuries received by the brig in a collision which occurred on September 9, 1869, between the brig and the schooner Eri, whereby the former was disabled and greatly damaged. Heavily laden with iron, the brig was bound on a voyage from Ardrossan in Scotland to Portland in this district. The schooner was employed in the coasting-trade, and was also bound to Portland to deliver a cargo of staves which she had shipped at Norfolk in the state of Virginia. Both vessels had proceeded in safety until they arrived off the coast of Maine, a day or two previous to the disaster. They both encountered a severe gale the day prior to the collision, which prevented the schooner from coming into the harbor, and caused considerable damage to the sails of the brig as she approached the coast, making it necessary, in the judgment of the master, to reef the main-trysail to keep the vessel to the wind. He lost during the gale the main-topsail, and the upper and lower fore-topsails, but having reefed and set the trysail, and tried the pumps, he sent one watch below at a quarter before one o'clock, and went below himself for a brief period. On his return to the deck he heard some one forward "singing out." His account of the matter was that at first he did not understand what it was, but that he immediately went on to the top-gallant forecastle, and while there discovered that it was a vessel directly ahead of the brig. Inquiry was at once made by him of the man at the wheel how the helm was, and the witness testifies that he received for reply that it was hard a-port, and that he gave directions that it should not be changed without his orders. Although the schooner was exposed to the same gale of wind, she rode it out without much if any injury. Some of her deck load was washed overboard, and three or four thousand staves were lost between eight and ten o'clock. Before ten o'clock the violence of the gale abated, but there was still a strong wind, and the schooner remained "hove-to" under double-reefed mainsail, the master not feeling safe to make sail on the vessel on account of the sea and the wind. Attempt was made near midnight to work the pumps, but the position of the deck load had been so changed by the sea during the gale that the men could not use the brakes. During that period the master was at the wheel, but the mate with all hands was forward, engaged in the attempt to work the pumps. Subsequently the mate came aft and took the wheel, and the master went forward as far as the middle of the deck, when on looking ahead he saw a light. Unable at first to determine what kind of light it was, he called the pilot, and directed his attention to it, who at once said it was a red light, when he, the master, gave the order to port the helm and to loose and hoist the jib as quick as possible. He also directed the watch to let go the main-sheet and to drop the peak, and it appeared that these several orders were promptly obeyed, but it was too late, and the two vessels came together, and the brig received the injuries described in the libel.

A. A. Strout, for libellant.

T. B. Reed, for appellants.

CLIFFORD, Circuit Justice. Maritime liens are founded in commercial usage, and it is well-settled law, in the jurisprudence of the United States, that the proper remedy of a party to enforce the same, whether the lien arises in consequence of a marine tort or from the breach of a maritime contract, is by a suit in rem commenced in the district court of the United States, where the res or the offending thing is found. The Belfast, 7 Wall. [74 U. S.] 642. Jurisdiction, where the proceeding is in rem to enforce a maritime lien, is exclusive in the district courts, but the suit may be instituted in any district where the res or the offending thing is found, whether the injury for which satisfaction or compensation is sought occurred in that district or elsewhere within the United States, or upon the high seas. Process in rem is founded on a supposed right in the thing, and the object of the process is to obtain the thing itself, or a satisfaction out of it, for some claim resting on an alleged proprietary right in the thing w. 'ch the process commands shall be arrested, and held subject to the final order of the court. The Commerce, 1 Black [66 U. S.] 580.

(At this point the court reviewed the facts found in the foregoing statement.)

Unquestionably the orders given by the master of the schooner were the proper ones, if they had been seasonably given, to have avoided a collision, and inasmuch as they were promptly obeyed, the conclusion is irresistible that they were too late to effect the desired object. Two defences are set up by the appellants, which are not in all respects consistent, either in theory or in fact: 1. That the collision was occasioned by the negligence of the officers and crew of the brig in not keeping her on her course just before and at the time when the collision occurred. 2. That it was the result of inevitable accident, and consequently that the owners of the schooner are not liable for the damages sustained by the brig. Testimony was taken on both sides, and the parties were heard and the district court entered a decree for the libellant in the sum of $2,854.80, whereupon the respondents appealed to this court.

Since the appeal the parties have been heard in this court upon the same testimony

as that exhibited in the court below. Much comment upon the first defence set up by the respondents is unnecessary, as it finds no substantial support in the evidence. A mere general allegation of negligence, without specifying in what the negligence consisted, is hardly sufficient to constitute a valid defence, even in pleading, and the answer in this case is not much better, as it only alleges that the officers and crew of the brig were negligent in not keeping the vessel on her course, without any specification as to what was done or omitted to be done, which caused or promoted the disaster. Suppose, however, that the answer is sufficiently explicit, still it is quite clear that the charge is wholly unsustained by the testimony, as the brig was lying-to on the starboard tack, having a competent lookout properly stationed on the vessel, with her signal-lights fully displayed, as required by law. Further argument upon that topic is unnecessary, as the defence finds no substantial support in the testimony, as is pretty much conceded by the respondents. Inevitable accident was the principal defence to the libel in the district court, and it is the defence chiefly relied on in this court. Cases of collision arise where the disaster was occasioned exclusively by natural causes, without any fault either on the part of the owners of the respective vessels or of those intrusted with their care and management, and where the facts are so the rule of law is that the loss must rest where it fell, on the principle that no one is responsible for such an accident. The Pennsylvania. 24 How. [65 U. S.] 307; The John Frazer, 21 How. [62 U. S.] 194; The Morning Light, 2 Wall. [69 U. S.] 550; The Shannon, 1 W. Rob. Adm. 463.

Where either party is guilty of negligence or fault, such a rule cannot be applied, as the libellant is entitled to recover if the respondent alone was in fault; and if the libellant alone was in fault, the libel must be dismissed; and it is equally clear that the damages must be apportioned between the offending vessels in all cases where both vessels were in fault. Sufficient has already been remarked to show that the brig was not in fault, so that the only remaining inquiry is whether fault is justly imputable to the schooner. Fault is imputed to her in the libel, and if that allegation is sustained the decree should be affirmed, and, if not, it must be reversed, as where neither party is in fault the loss must rest where it fell. Both vessels were lying-to just prior to the collision. Doubts were entertained at the argument whether the fact was so in respect to the brig, but a careful revision of the testimony on that point shows that the allegation of the libel as amended, states the case correctly. Two faults are imputed to the schooner, and, if either of the allegations is sustained, the libellants must prevail. They are as follows: 1. That the schooner had no lookout properly stationed on the vessel. 2. That she had no signal-lights, or that they were not properly

displayed just before nor at the time when the two vessels came together. All of the schooner's company were on deck at the time of the collision, but no one of them had been assigned to duty as lookout during any part of the night, and it does not appear that any one of the number was attending to that duty just before the lights of the brig were discovered. On the contrary, they were all abaft the mainmast when the master, having discovered a light ahead, called the pilot and inquired of him what it was, and the case shows that the pilot immediately said it was the red light of a vessel.

Prior to the time when the pilot came on deck at the call of the master, it does not appear that the lights of the brig had been discerned by any person on board the schooner, except by the master, although the vessels were in very close proximity, and the danger of collision was imminent, as is apparent from the testimony of the master, who first discovered the light. By his own testimony, it appears that he gave immediate orders to the man at the wheel to port the helm, and directed the men to hurry forward and hoist the jib as quick as possible, telling them to cut the gaskets if they found it difficult to unfasten them, showing that the danger, in his view, was a pressing one, and that it called for the utmost promptitude. Before he gave that order he says he noticed that the red light of the schooner was burning brightly in the screen where it belonged, and that he also looked at the green light as he went forward, and that it also was burning, but not so brightly as it ought to have been; that he tried to "turn it up," and that it went out entirely; that he then took it down and handed it to the first man he met, and he admits that he does not know that it was again put into the rigging. He subsequently saw that light in the hands of one of the crew on the starboard side of the vessel, but he states in the same connection that the jib-boom of the brig was at that time nearly over the schooner. Evidently the time for precautions was past, as the collision was inevitable. Lookouts and lights were wanted earlier, and any attempt to supply their deficiency at that moment cannot operate as a valid excuse for the neglect to supply them in season, as required by the rules of navigation. Extended argument to show that the rules of navigation require that a vessel should have a lookout properly stationed on the vessel is unnecessary, as the views of this court have been too fully and too often expressed upon the subject to require their repetition to enforce the proposition. Sailing-ships as well as steamers navigating in the thoroughfares of commerce must have a constant and vigilant lookout stationed in a proper place on the vessel, and charged with the duty for which a lookout is required, and he must be actually employed in the duty to which he was assigned. Lookouts stationed in positions where the view is obstructed either

by the lights, rigging, or spars of the vessel, do not constitute a compliance with the rules of navigation, as seamen when they are so situated are as incompetent to perform that duty as if they were physically incapable of seeing an approaching vessel. Chamberlain v. Ward, 21 How. [62 U. S.] 570. Perhaps one lookout is sufficient for small vessels, but they should never be without some one to perform that important duty. The Keystone State, 22 How. [63 U. S.] 471; Whitridge v. Dill, 23 How. [64 U. S.] 448; The Morning Light, 2 Wall. [69 U. S.] 550; Amoskeag Manuf'g Co. v. The John Adams [Case No. 338].

Strong doubts are also entertained whether the schooner can be held to be excused for the condition in which her lights were at the time of the accident, but it is not deemed necessary to enter very fully into the consideration of that subject, as it is clear that she was in fault in not having a competent lookout properly stationed on the vessel. Her lights certainly did not comply with the fifth article of the sailing rules, and the evidence does not bring the case satisfactorily within the exceptional regulations established by the sixth article (13 Stat. 59).

Decree affirmed with costs.