## THE VIOLA.

## HAWKINS v. THE VIOLA.

### (District Court, S. D. New York. December 18, 1893.)

1. COLLISION—SAIL VESSELS—BAD LIGHT—BAD LOOKOUT—MISTAKE OF BEARING.

The schooner M., bound east in Long Island sound, came in collision with the schooner V., bound west, about south of Stonington light, the wind being moderate from the northward. Upon conflict of testimony it was found that the M. was closehauled, and a little on the starboard bow of the V., which had the wind two or three points free. The night was clear and starlight. The V.'s lights were seen at a considerable distance, but neither of the M.'s lights were seen before collision, though looked for by both the master and mate, when the M. was first seen by them, only 200 yards away, when the Viola improperly put her helm hard a-port and ran into the M. *Held*, both liable,—the M. for not showing proper lights; the V. for not seeing the M., on such a night, in time to avoid mistake in the bearing of the V., and the consequent erroneous luff.

2. STATUTORY CONSTRUCTION—CARRIERS' ACT OF FEBRUARY 13, 1893—APPLIES ONLY TO CARGO OF THE VESSEL IN FAULT—REPUGNANCY.

The general words of a statute may be limited to the subject-matter to which the statute relates, as indicated by preceding or following words: *Held*, accordingly, that section 3 of the act of February 13, 1893, providing that under certain conditions, "neither the vessel nor her owner," etc., "shall be held responsible for loss resulting from faults in navigation," applies only to the claims for loss to cargo on board the vessel in fault; the preceding and following words indicating that the statute is dealing only with the relations between carriers and the cargo on board. *Held*, also, that this clause of the act is not repugnant to the sixth clause, providing that it shall not modify section 4283 of the Revised Statutes; since the latter applies only to cases where a legal liability exists, and does not prescribe when any legal liability for a loss shall or shall not arise.

In Admiralty. Libel by J. Clarence Hawkins against the schooner Viola for collision. Decree for divided damages.

Owen, Gray & Sturges, for libelant.

Wing, Shoudy & Putnam, for respondent.

BROWN, District Judge. On the 7th of November, 1893, at about 2 A. M., the libelant's schooner Monette, bound east in Long Island sound, was sunk, through a collision with the schooner Viola, bound west, at a point about south of the Stonington light. The above libel was filed to recover for the damages to the Monette and her cargo.

The wind was moderate, from the northward. The Monette had been previously making a course of east half north, and claims to have been closehauled on her port tack. The Viola had been making a course of west half north, admitting that she had the wind a little free. Each was making some four or five knots an hour. If the Monette was closehauled, it was the duty of the Viola to keep out of her way. But the latter contends that the Monette also had the wind two or three points free, and that it was consequently her duty to keep out of the way of the Viola. For the latter it is also contended that the Monette, as she approached,

showed no colored lights, and that the collision was solely the fault of the Monette.

The master of the Monette was on the lookout forward, and testifies that both the Viola's colored lights were seen at a considerable distance, and continued to be seen a little on the starboard bow, until when about four or five lengths distant the red light was shut in and the green light only seen, still on the starboard bow; that the Monette then luffed a very little to the northward, so that her sails trembled, to give the Viola a little more room; but that the Viola, by a strong luff, turned to the northward and struck the Monette between the fore and main rigging, causing her to sink in a few minutes.

On the Viola the mate was forward, and the wheelsman and captain aft. Nothing was seen of the Monette, according to the testimony of the mate, until she was within two or three lengths; that is, less than 300 feet distant, when she was seen, as he says, about a half a point on the lee or port bow. She was immediately reported to the captain, who at once gave the order "hard a-port," and the wheelsman immediately proceeded to put the helm hard down; but before the wheel was down the vessels struck. No colored lights were seen on the Monette at any time.

The conflict of testimony in regard to the lights is embarrassing. Not long before, the mate of the Viola had gone forward to relieve the former lookout, who, at the same time, went aft to relieve the mate at the wheel. The first that he saw of the Monette was when she was some two or three lengths off, as he estimates; and then he did not see any colored light, nor any light, up to the time of collision, though the Monette passed partly across his bow. He reported her to the captain as showing no lights; the captain looked and saw the Monette, but no light. Upon this testimony, I must hold that the Monette's colored lights were not properly showing at that time. The Excelsior, 33 Fed. 554; The Eri, 3 Cliff. 456; The Monmouthshire, 44 Fed. 697; The Drew, 35 Fed. 791, and cases there cited.

I think the weight of evidence is to the effect that the Monette was sailing practically closehauled, and that the Viola had the wind several points free. I am confirmed on this latter point by the fact that the sails of the Viola were full at the time of collision, though her wheel had been put to port, though not yet hard down. So small a vessel—less than a hundred feet long—would luff pretty rapidly. The sails of the Monette, on the other hand, were shaking at the time of the collision, from the effect of a slight luff. I do not lay much stress on the testimony in regard to the angle of collision in the night. It was probably considerably less than seven points.

I am constrained to find that a good lookout was not kept up on the Viola. The night was clear and starlight, and the sea smooth. A vessel under sail, without lights, according to the testimony, could be seen a quarter of a mile off; and this is not contradicted. From the testimony before me in other cases, this

seems to me a very moderate estimate. Yet the Monette was not seen, or reported, as the mate estimates, till within a few lengths, when there was not time ·even to put the wheel hard over before collision. Had the Monette been seen, as she ought to have been seen, when a quarter of a mile distant, I cannot doubt that the Viola· could easily have kept out of her way, even though no light was seen on the Monette.

There is a conflict of evidence as to the bearing of the two vessels. The Viola claims that the Monette was seen under her port bow. The witnesses for the latter testify that for a considerable period before the collision the green light only of the Viola was visible, showing that she was on the Viola's starboard bow. The failure of the Viola to notice the Monette until she was so near, may well have led to imperfect observation and mistake as to the precise bearing of the Monette. I am constrained to find ·that the latter was in fact on the Viola's starboard bow, and that this mistake led to the collision through the order given to port, instead of to starboard, the Viola's helm. This mistake was so near collision as not to be itself ascribed as a fault; for it was doubtless the effect of the excitement in extremity. But as this arose in consequence of the Viola's fault in not maintaining a good lookout, and of not seeing the Monette in time for correct observation of her course, and proper maneuvers, the latter fault precludes the Viola from the defense of error in extremis. The Elizabeth Jones, 112 U. S. 514, 5 Sup. Ct. 468.

As I find the collision was the result of fault on both sides, the damages and costs are divided.

---

(January 16, 1894.)

Since the foregoing decision was rendered, the attention of the court has been called to the third section of the act of February 13, 1893, (27 Stat. c. 105, p. 445,) which provides as follows:

"Sec. 3. That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, (a) neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel; (b) nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

The answer alleges that the Viola at the time of collision was engaged in transporting merchandise from ports in Canada to New York; and that her owners had exercised due diligence to make her in all respects seaworthy and properly manned, equipped and

supplied. Evidence was given to that effect. Those facts are not denied, but are now admitted by the libelant; they were not referred to on the previous argument.

The defendant contends that the words of the first clause of the third section above quoted, are to be applied generally as respects all claims against the vessel or owner arising from faults of navigation, including claims such as this for damages to other vessels and their cargoes through collision, as well as against claims for damage to cargo on board the vessel in fault.

This construction would annul probably nine-tenths of all the responsibilities of carriers by sea. It would involve a change in the law of shipping so radical and so wide-sweeping in its consequences, that I cannot believe it was the intention of congress to enact a change so revolutionary in the incidental manner, and in the connection, in which this clause appears in this act. Taken as a whole, the act seems to be dealing with the rights, relations and remedies between ships and owners transporting merchandise, and the cargo on board. The first two sections relate solely to bills of lading, and disable the owner from absolving himself or his vessel from responsibility for negligence in the stowage, care or handling of goods; while the third section, treating in part of the same subject of bills of lading, purports to relieve the vessel and owner of part of their liability under the existing law, for faults of navigation.

In the house of lords, Lord Halsbury, in the case of Insurance Co. v. Hamilton, 12 App. Cas. 484, 490, refers to "two rules of construction now firmly established as part of our law. * * * One is, that words, however general, may be limited with respect to the subject-matter in relation to which they are used. The other is, that general words may be restricted to the same terms as the specific words that precede them." See, Per Wallace, J., in U. S. v. Buffalo Park, 16 Blatchf. 189, 190.

The intention, which forms the governing principle of the law, is to be extracted from the entire enactment. U. S. v. Collier, 3 Blatchf. 332.

Upon these maxims of construction, the general words of section 3 should be limited to the subject of the act, as shown by the words that precede and follow the clause in question, viz., the mutual rights and obligations between the carrier, the carrying vessel, and the goods carried. The third section is, moreover, expressly confined to "vessels transporting merchandise;" thus apparently excluding tugs, passenger vessels, and possibly vessels in ballast. Had the statute designed a change in the general principle of maritime responsibility, such an exclusion would not have been probable. See In re Hohorst, (Dec. 18, 1893,) 14 Sup. Ct. 221.

The same view is to some extent further confirmed by the saving clause of the sixth section of the act, which provides, "that this act shall not be held to modify or repeal * * * section 4283 of the Revised Statutes, [limiting the whole liability of the

shipowner to the value of his interest in the ship and the pending freight,] or any other statute defining the liability of vessels." For although I do not perceive how section 4283 would in strictness be "modified or repealed" by either the broad or the more limited construction of section 3, the saving clause being as respects section 4283 apparently superfluous; still, there would be less reason for the careful preservation of section 4283 if congress had intended to sweep away nine-tenths of the liabilities to which it is applicable.

There can be no doubt that by section 3 the act intended to absolve the vessel and owner from the claims of the cargo on board arising out of faults of navigation, under the conditions stated. Its plain language requires at least that much. The sixth section is not, I think, repugnant to the third; because section 4283 does not at all define, and was not intended to define, the conditions under which a legal claim arises against the shipowner for any damage or loss therein referred to. It only provides, in effect, that whenever legal claims do arise against him for loss or damage, his liability shall not exceed the value of the ship and freight. To enlarge or to diminish by statute the cases in which legal claims for damage shall be held to arise, is not, therefore, "to modify or repeal" section 4283.

The fact that the L. Monette may not be liable for the damage to her own cargo, partly through her faulty navigation, does not affect her right to recover against the Viola for that damage; since the Monette remains bailee of the cargo, and responsible as such for its proper care and delivery.

A similar oral ruling upon the construction of this statute has been made by Judge Carpenter in the district of Rhode Island, upon the hearing of exceptions to the libel.

Decree accordingly.