## THE SILVIA.

### FRANKLIN SUGAR REFINING CO. v. RED CROSS LINE.

(Circuit Court of Appeals, Second Circuit. May 28, 1895.)

1. SHIPPING — DAMAGE TO CARGO—SEAWORTHINESS—NEGLIGENT MANAGEMENT.
   The fact that ports only eight inches in diameter, situated eight or nine feet above the water, are closed at the commencement of a voyage only by heavy glass covers, set in brass frames, leaving open additional iron covers with which they are provided, does not constitute unseaworthiness; and if the failure of the officers to have the iron covers closed upon encountering rough weather is a fault or negligent omission, it is one occurring "in the management of said vessel," from the results of which the owner and vessel are freed from liability by section 3 of the act of February 13, 1893.

2. SAME—FOREIGN VESSELS.
   Section 3 of the act of February 13, 1893, which relieves vessels and their owners from liability for loss or damage resulting from faults or errors in navigation or in the management of the vessel, if the owners have exercised due diligence to make her se vorthy, and have her properly equipped, manned, and supplied, applies to foreign vessels transporting merchandise to or from American ports as well as to American vessels.

Appeal from the District Court of the United States for the Southern District of New York.

This was a libel by the Franklin Sugar Refining Company against the steamship Silvia to recover for damage to cargo. The district court dismissed the libel (64 Fed. 607), and the libelant appeals.

Wing, Putnam & Burlingham, for appellant.

Convers & Kirlin, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. The cargo for the injury to which this suit was brought was shipped at Matanzas for Philadelphia under a bill of lading which provided for the delivery in good order and well conditioned, "the dangers of the seas only excepted." It was injured

by sea water, which came through a port in one of the compartments of the between decks, which had been recently fitted up to carry steerage passengers, but which at the time was only used for the storage of ropes and extra gearing. The port was one of several in the compartment, was of the diameter of eight inches, was furnished with a heavy glass cover, set in a brass frame, and also with an extra cover of iron, and was eight or nine feet above the water when the vessel was deep-laden. When the steamship left Matanzas the weather was fine. None of the ports in the compartment were closed otherwise than by the glass cover, and the hatch, which was the only entrance to the compartment, was battened down. After getting out to sea, rough weather was encountered, and soon after, and when the steamship had been six or eight hours on her voyage, it was found that water was entering the engine room. An investigation ensued, which resulted in ascertaining that the glass cover of one of the ports was broken, and the water had entered in consequence. Whether the cover was broken by the force of the seas, or by floating timber, or a piece of wreckage, was wholly a matter of conjecture. The officers of the vessel regarded the glass covers as strong enough to resist ordinarily heavy seas, and seem to have left the iron covers unclosed intentionally upon the present voyage, in order that the compartment might be light in case it became necessary to visit it. In every other respect, save that when she sailed the iron shutters were not fastened over the ports. the vessel was tight, staunch, and fit for the voyage.

The learned district judge who heard the cause in the court below was of the opinion that the steamship was not in a seaworthy condition at the beginning of her voyage, but that her owners had used due diligence to make her so, and consequently that she was exonerated from liability for the injury to the cargo by the provisions of the act of congress of February 13, 1893, relating to navigation of vessels, commonly known as the "Harter Act."

We are of the opinion that the steamship was not unseaworthy when she began her voyage. Granting that the glass covers were not a sufficient protection for the ports in rough weather, they were adequate for fair weather, and it would have been but the work of a few moments to unbatten the hatch of the compartment, and close them with the iron covers. In the state of the weather during the first few hours of the voyage there was no necessity for closing the ports with the iron covers; none even for closing them with the glass covers; and it can hardly be imagined that a storm would be encountered without premonitions affording ample time for access to the compartment, and for fastening the iron covers. The case of Steel v. Steamship Co., 3 App. Cas. 72, is quite in point. In that case a cargo of wheat was damaged by sea water entering a port about a foot above the water line, owing to the insufficiency of the fastenings. The special finding of the jury did not state whether the insufficient fastening of the port happened before starting on the voyage or afterwards. The bill of lading contained the usual negligence exemptions, which were sustained in the court below, where judgment was given for the defendants. On appeal it

was held that the judgment must be reversed, and the cause remanded for a specific finding as to whether the port was insufficiently fastened when the steamer sailed, and, if so, whether the cargo was so stowed with reference to the port that it could not be readily closed on short notice, on the approach of storm. Lord Blackburn expressed the opinion that if the port was in a place where it would be in practice left open from time to time, but was capable of being speedily shut if occasion required, the vessel could not be said to be unfit to encounter the perils of the voyage; that if, when bad weather threatened, it was not shut, that would be negligence of the crew, and not unseaworthiness of the ship.

If the steamship was seaworthy, she was nevertheless liable for the loss, notwithstanding the exception against dangers of the seas in the bill of lading, if those in charge of her navigation were negligent in not causing the port to be sufficiently secured after the steamship got out to sea, unless the act of congress relieves her. Whether they were justified in supposing that there could be any reasonable apprehension of risk from a port so small and so high above the water line as this, protected as it was by a glass cover of such thickness, is a question of fact in respect to which different minds might differ. Assuming, however, that they were not, and that they were negligent in not putting on the iron cover, we think the case is controlled by the act of congress, and that its provisions relieve the steamship from liability. Section 3 of that act provides:

"If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent or charterers shall become or be held responsible for damage. or loss resulting from faults or errors in navigation or in the management of said vessel, nor shall the vessel, her owner or owners, charterers, agent or master be held liable for losses arising from dangers of the sea or other navigable waters."

It is perfectly obvious from the language of this act that congress intended to relax the severity of the obligation imposed on the shipowner as a carrier of goods by the pre-existing law as it had been declared by the courts. It had long been determined that in every contract for the carriage of goods by sea there is an implied warranty that the vessel is seaworthy at the time of beginning her voyage, unless this is superseded by some express condition in the contract. The very term "warranty" imports an absolute undertaking that the fact is as represented; and it was the settled meaning of the term as implied in contracts of affreightment or of insurance that it is an undertaking by the shipowner not only that he will exercise due diligence to have the vessel seaworthy, but that she shall really be so. "If there should be a latent defect in the vessel, unknown to the owner, and not discoverable upon examination, yet the better opinion is that the owner must answer for the damage caused by the defect." 3 Kent, Comm. 205. Modern adjudications affirm this proposition in the strongest terms, and declare the implied warranty to be an absolute undertaking, not dependent on the owner's care or negligence, that the ship is in fact fit to undergo the perils of the seas, and other incidental risks, covering latent defects, not ordi-

rarily susceptible of detection, as well as those which are known, or are discoverable by inspection. The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823; The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537. It has also always been the law that the exemption of the dangers of the seas in the bill of lading or other contract of affreightment does not exonerate the shipowner from responsibility for injury to the goods which results from a breach of his implied obligation to provide a seaworthy vessel. Thus the carrier was responsible for a loss produced by the dangers of the sea if it was one which would not have happened except for the concurrence of some unknown and undiscoverable defect in the equipment of the vessel, which defect, because it was not discoverable, could not be remedied. In the place of this responsibility the act of congress substitutes a less stringent one by declaring that if the owner shall exercise "due diligence" to make the vessel in all respects seaworthy, neither he nor the vessel is to be responsible for damages or loss in transporting merchandise, resulting from "faults or errors in her navigation or management," nor for losses arising from dangers of the sea. Other sections of the act emphasize the meaning of the particular section. Sections 1 and 2 prohibit carriers from relieving themselves by contract from the obligation of exercising "due diligence to make their vessels seaworthy," or from liability for loss or damage to cargo arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery; that it does not prohibit them from displacing by contract the warranty of seaworthiness, or their responsibility as insurers of cargo. Read as a whole, the purpose of the act manifestly is, on the one hand, in the interests of the public, to prevent carriers from evading responsibility to exercise due diligence in providing seaworthy vessels, and in the handling and care of the cargo; and, on the other hand, whenever they have exercised due diligence in these respects, to absolve them from liability for losses arising during the transit from the perils of the sea and from faults or errors in the navigation or management of vessels.

Doubtless the act does not prevent the carrier from waiving by contract with the cargo owner those provisions which relax his ordinary obligations. He may do so by a charter party or bill of lading containing an express warranty of seaworthiness, or by a foreign contract with the provision that it shall be governed by the law of the place of the contract. But his responsibility to a cargo owner who sues in the courts of this country cannot be curtailed in any of the particulars prohibited by the act, and he is entitled to the benefits of the less rigorous liability which is substituted in place of his liability as an insurer.

It has been urged that section 3 is not intended to apply to foreign vessels, but the argument finds no support in the language of the section; and the intention to subject foreign vessels to a measure of responsibility, which is, as to domestic vessels, regarded by the act as too severe, ought not to be unnecessarily imputed to congress.

In the present case the vessel owners certainly did exercise due diligence to make the vessel seaworthy, and, if the failure to fasten the port with its iron cover was in any sense a fault or negligent

omission, it was one in the management of the vessel, committed by those in charge of her navigation after she had started on her voyage.

For these reasons we conclude that the district court properly dismissed the libel, and that the decree should be affirmed, with costs.