### THE E. A. SHORES, JR.

### MANEGOLD et al. v. THE E. A. SHORES, JR., et al.

(District Court, E. D. Wisconsin. March 7, 1896.)

1. SHIPPING—DAMAGE TO CARGO—HARTER ACT—LAKE COMMERCE.
   The third section of the Harter law (Act Feb. 13, 1893), which provides that, if the owner of any vessel transporting property "to or from any port of the United States" shall exercise due diligence to make her seaworthy and properly manned, equipped, and supplied, he shall not be liable for damage resulting from faults of navigation or management, etc., applies to vessels engaged in commerce on the Great Lakes, notwithstanding that sections 1, 2, and 4 of said act, which relate to limitations of liability by provisions in contract of affreightment, are expressly confined to shipping "between ports of the United States and foreign ports."

2. SAME—SEAWORTHINESS—DEFLECTION OF COMPASS.
   Where a vessel deviated from her course in the night, and ran upon a well-known reef, held, that the existence of a deflection of her compass of about ⅛ of a point was not sufficient ground for finding her unseaworthy, especially in the absence of any showing of its continuance for sufficient time to require notice.

3. SAME—FAULTS OF NAVIGATION.
   Faults consisting in failure to heed the warning of a government light, which indicates the location of a reef, and in presuming upon the entire accuracy of the compass or course, or upon deceptive appearances of distances, etc., are "faults or errors of navigation," within the meaning of section 3 of the Harter act.

Libel in rem by Charles Manegold and others, owners of a cargo of wheat shipped on the propeller E. A. Shores, Jr., to recover for damages sustained by alleged negligent stranding of the vessel, and negligence after the stranding.

The E. A. Shores, Jr., is a steam freighter, launched in the fall of 1892, and engaged in general service on the Great Lakes. At the close of the season of 1894, she was laid up for the winter; but before the usual opening of navigation, in the latter part of February, 1895, her owners made oral agreement with the libelants to carry wheat from Chicago to Milwaukee, on a freight of three-quarters of a cent per bushel. This was an unusual and experimental engagement for winter navigation. The steamer was put into commission for the purpose, with Capt. Olsen (who was owner of one-twelfth part of the ves-

sel, and had sailed her the previous two seasons) as master, and Capt. Christopher (a master pilot of many years' experience and excellent reputation) as chief mate, and a full complement of officers and men. The first cargo had been delivered, and on the morning of March 8, 1895, she had taken in her second cargo of 25,000 bushels, but did not leave port until midnight, as it was snowing and stormy. Her course was set for Milwaukee at 12:30 a. m., and, it being the mate's watch, the master left the chief mate in charge, with instruction to keep the vessel "north three-quarters west, or close along the shore, and to haul her out when he thought it fit to go out in the lake a little further, using his own judgment." The weather was cold and clear, and the wind southwest, off land, and of a velocity of about 12 miles an hour, but no ice was encountered to interfere. The mate says he kept her N. ¾ W. until abreast of Waukegan, and then due north, a course which would appear to have been generally proper under the circumstances of wind and weather, and, according to the showing as marked out on the chart, would have cleared Racine Reef by about one mile if there were no deviation; but, from some cause, the steamer had been taken too far to the westward, and at about 5:30, or a few minutes earlier, on the morning of March 9th, struck the southeast edge of this reef, and stranded, the vessel going at a speed of about 12 miles an hour, which had been kept up steadily throughout her course. The mate, lookout, and wheelsman were all at their stations, were mariners of experience and good reputation, according to the testimony, and the only excuses which are offered for running upon this well-known reef are (1) that the red light covering the reef was not then visible; (2) that the action of wind and currents must have carried the vessel imperceptibly landward; (3) that the cold weather caused a haze over the surface of the water, which gave deceptive appearance to the lights on shore, as two or three miles further distant than they were in fact. On the part of the libelants it is claimed (1) that there was a manifest deviation of the compasses, which were neither properly tested, corrected, nor was the deviation allowed for in navigation; (2) that there was no proper watch maintained, or the danger would have been shown by the bearing of the flash light, which had been clearly visible for an hour and more. Just north of the port of Racine, Wind Point juts out into Lake Michigan as a prominent landmark of the west shore, and the government has provided a lighthouse there, which is described in the official publication as a "conical tower, 102 feet high," with a "coast light, flashing white light, 30 second intervals, visible 8½ miles, covering Racine Reef from watch-room window." This reef upon which the steamer stranded is a well-known source of danger to navigation along the west shore of the lake, lies about four miles south and slightly eastward of Wind Point, and nearly opposite the harbor entrance. It is about a mile long, and a half mile wide, and is about sixty-five miles from Chicago. The first effort to release the steamer was promptly taken in bringing from Milwaukee the wrecking tug Welcome, which made the attempt that same morning, aided by the tug Dixon, of Racine; but it was found that the Shores filled with water to such extent that she was liable to founder if pulled off. That method was therefore abandoned. The Welcome was then sent to Milwaukee for a steam pump and lighter. On their arrival a force of men was taken out. The dry wheat was shoveled upon the lighter from the fore hatch. The pump was placed in operation at the after hatch, taking out wheat with the water, and the vessel was released on the morning of March 11th, but the pump was so far unable to control the inflow of water that she foundered just inside Racine harbor. Another lighter was procured to receive the outflow from the pumps, and save such of the wheat as could be thus held, and the steamer was taken to a dock. A diver was procured, and a jacket adjusted, to enable the steamer to reach Milwaukee. Bulkheads were put in to save wheat, but the libelants claim that there was negligence after the stranding in failure to have steam pumps brought on the Welcome from Milwaukee at the outset; in failure to procure lighters immediately (either from Milwaukee, or in utilizing vessels then lying up the river, in the ice, at Racine), to take off the wheat which had not been reached by the water, and to save wheat taken out by the pumping; in general inattention to save and care for the cargo, and neglecting to provide guards, whereby large quantities were stolen or carried off from the steamer and lighter in port; and, finally, in refusing to deliver the remnant

of the cargo at Racine, causing further injury by retaining it in the vessel until arrival at Milwaukee. Capt. Starke, claimant and owner of eleven-twelfths of the steamer, was on board, having taken passage from Chicago, but had no part in her navigation. Upon the stranding, he promptly ordered out the yawl boat for Racine, and by telephone summoned the wrecking tug Welcome (of which he was part owner), and it arrived without delay. Capt. Starke was manager of the principal corporation at Milwaukee engaged in wrecking, had great experience in that line, and was active in aiding the operations in question; but, after the arrival of the wrecking outfit, Capt. Gillen, of Racine, had charge of the operations, and his ability and experience for such purposes are unquestioned.

Van Dyke, Van Dyke & Carter and J. C. Richberg, for libelants.

M. C. Krause, for claimants.

SEAMAN, District Judge (after stating the case as above). The circumstances in this case and the peculiar questions involved have required the taking of a large amount of testimony, all heard in open court, and I have attempted only an outline of the general facts, and of the claims urged on behalf of the libelants, without aiming to summarize the evidence, which would unduly extend the opinion.

Primarily, the rule of liability must be ascertained which governs this contract of affreightment,—whether the provisions of section 3 of the act of congress of February 13, 1893, entitled "An act relating to navigation of vessels, bills of lading, and to certain obligations, duties and rights in connection with the carriage of property" (27 Stat. 445) are applicable thereto; and, if that section applies, to what extent does it affect liability under the state of facts here shown. The act referred to, which is generally known as the "Harter Act," has received construction in several of the courts at the seaboard, including the circuit court of appeals for the Second circuit, but in reference only to carriage between foreign and domestic ports, and, as applied therein, to foreign as well as to domestic vessels, and no adjudication has been found whereby section 3 or any provision of this act was expressly held to govern the transportation contracts of domestic vessels between domestic ports. As here presented, the question is therefore new, is important and far-reaching, affecting all the great shipping interests upon inland waters, and becomes controlling under the view which I must take of the facts established by the testimony; and, for its consideration, acknowledgment is due to counsel for valuable aid furnished by their research and arguments. Sections 1, 2, and 4 of the act refer solely to shipping "between ports of the United States and foreign ports," and prohibit stipulations or covenants in bills of lading exempting the vessel owner from liability for negligence or faults in navigation or in the care of property carried, or from the exercise of due diligence to equip and make the vessel seaworthy, or to lessen the obligations of master or crew to care for the stowage and delivery of goods. Section 3 provides as follows:

"If the owner of any vessel transporting merchandise or property to or from any port of the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent or charterers, shall

become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel, nor shall the vessel, her owner or owners, charterers, agent, or master, be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or for any deviation in rendering such service."

In construing a statute, it is the duty of the courts to give effect to the intention of the lawmaking power, and the intent must first be sought in the language of the act itself. "Where that which is directed to be done is within the sphere of legislation, and the terms used clearly express the intent, all reasoning derived from the supposed inconvenience, or even absurdity, of the result, is out of place. It is not the province of the courts to supervise legislation, and keep it within the bounds of propriety and common sense." Suth. St. Const. 316. Section 3, above quoted, is clear and explicit in its general application to "the owner of any vessel transporting merchandise or property to or from any port of the United States"; but it is contended by the libelants that because the other sections of the act (both preceding and following) which prohibit the issue of bills of lading containing certain exemptions from liability are confined to contracts of affreightment between domestic and foreign ports, and inasmuch as section 3 does not expressly name vessels engaged in trade between ports of the United States, it should be limited by construction to the class of shipping mentioned in the other sections, namely, to vessels in trade with foreign ports, and of no effect upon the great shipping interests engaged in domestic commerce. Neither the language here employed nor the manifest purpose of the other provisions would permit such restriction to be placed upon this section by interpolation. For the control of provisions in contracts of affreightment which were exclusively domestic, there was no need of congressional enactment against exemptions from the common-law liability of carriers, because such inhibitions had become well established by adjudications, in the federal courts at least. Therefore, the sections relating to the bills of lading may be regarded as treating of contracts which were to such extent foreign in their nature that they were either beyond the reach of these judicial rules or their applicability was left in doubt. Previous to this enactment the supreme court had held, in Liverpool & G.W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, that a bill of lading issued by an English steamship company in an American port to an American shipper for the carriage of goods thence to an English port, where freight was to be paid in English currency, was an American contract, and governed by the American rule of law, which declared that stipulations therein undertaking to exempt the carrier from liability for the negligence of its servants were contrary to public policy and void, and that the English rule allowing such stipulations could not be invoked in their support; but the question was reserved from decision whether the stipulations would be saved by a provision in the contract that it should be governed by the law of

England. It appears from the reports and discussion in congress upon the bill which gave rise to the act in question that urgent complaints came from shippers to and from foreign ports of constant evasions of the rule as thus pronounced, by the insertion in bills of lading of a clause declaring it an English contract, and subject only to the liabilities imposed by English law. These sections respecting the terms of contracts for foreign affreightment were manifestly designed to prevent the evasions whereby those engaged in foreign trade took to themselves immunities which were prohibited to the great class of American vessels confined to domestic trade. That purpose is entirely compatible with the further purpose found in section 3, to relieve all vessels, whether in foreign or domestic trade, from certain of the liabilities which had theretofore attached as insurers of safe delivery, and to establish for all carriers by vessel the same measure of duty and responsibility. It concedes relief to the vessels in foreign trade, as compensation for taking away any right they might otherwise have to limit their liability by contract, and extends the same benefit to the domestic vessels which were previously held to their common-law liabilities.

This view is supported by the opinions of the circuit court of appeals for the Second circuit, construing this act in The Silvia, 15 C. C. A. 362, 68 Fed. 230, and The Carib Prince, 15 C. C. A. 385, 68 Fed. 254; also, in The Viola, 59 Fed. 634, 60 Fed. 296; The Berkshire, 59 Fed. 1007; The Silvia, 64 Fed. 607; The Etona, Id. 880; and in later cases in district courts. And in the history of the growth of the act in its course through congress, as found in 24 Cong. Rec. 147, 148, 171, 172, 1180, 1291, there is clear exposition of this intention in the amendments which were finally adopted. As introduced and adopted in the house, the title of the bill was as "relating to contracts of common carriers," etc.· Its provisions applied to common carriers by land and water, but with reference only to shipments to or from foreign ports; and its section 3 related only to foreign shipments, and was not so liberal in limitations as it now appears. The report upon it by the house committee on interstate and foreign commerce (page 148), and the remarks of members, show the understanding that its effect at that stage was only upon vessels engaged in foreign trade. In calling it up, the statement was made that it did not "in any manner concern or touch inland or coastwise commerce" (page 148), and its reputed author remarked, in advocating passage by the house, that it "does not affect one one-hundredth of 1 per cent. of American shipping," but would reach the foreign vessels which were then enjoying monopoly of the foreign trade (page 172). The transformation came when the bill reached the senate, where section 3 was amended by striking out all reference to foreign ports or trade, and applying its provisions to "the owner of any vessel transporting merchandise or property to or from any port of the United States"; and thereupon the new title was given to the act as a whole. From the debate in the house, after its return there, it appears that these amendments were the result of appeals from vessel owners generally for relief in some measure from the responsibilities imposed upon them as carriers; that they were agreed upon

in conferences between the committees of both houses; and that it was the final understanding the act would operate generally to limit this liability for all American vessel owners. Pages 1180, 1291. It is not for the courts to inquire whether the full extent and effect of this change was then in the legislative mind, or whether it was wisely or justly adopted, but the duty is imposed to ascertain the meaning of the language employed in the enactment, and to enforce the purpose thus expressed if within the powers of legislation.

The contention on the part of the libelants that the statute in question should be strictly construed, under the rule pronounced in the recent case of The Main v. Williams, 152 U. S. 122, 132, 14 Sup. Ct. 486, respecting the limited liability act (section 4283, Rev. St.), and that the liberal construction sanctioned in Moore v. Transportation Co., 24 How. 1, 39, and the line of subsequent decisions, should not be held, does not seem to me material in view of the history of this legislation and the explicit language employed. In strict construction, "effect is to be given to the plain meaning of the language," and it is only "where the effect is reasonably open to question" that strictness is to be applied. Suth. St. Const. § 350. I find no room for doubt of the clear import of the terms of section 3 as applicable to all contracts of affreightment on American waters, and that these provisions are entirely consistent with those specially made in the other sections for the foreign trade, and that section 3 governs this contract for transportation of wheat on Lake Michigan from Chicago to Milwaukee.

The further objection urged at the bar against this construction is not deemed tenable, namely: That it would thereby affect the great class of contracts of affreightment between ports of the same state, as well as those which were of interstate character, and would therefore constitute an exercise of power beyond the regulation of "commerce with foreign nations, and among the several states, and with the Indian tribes," granted by the constitution (article 1, § 8); that it thus interferes with legislation in many of the states respecting the liability of carriers within their jurisdiction, and is unconstitutional. The cases of The Fashion, 21 How. 244, The Goliah, Id. 248, and Trade-Mark Cases, 100 U. S. 82, are cited in support of this proposition. Whether the enactment could stand so far as concerns the instant case upon the fact that this contract was for transportation between Chicago and Milwaukee, and was therefore distinctly of interstate commerce, does not require determination (vide In re Garnett, 141 U. S. 1, 12, 11 Sup. Ct. 840), for the reason that the later decisions of the supreme court have established the doctrine that the powers of congress in this regard rested on broader ground than seems to have been recognized in the cases cited in 21 How.; holding, in effect, that the navigable waters of the United States are national highways, and subject to the national jurisdiction; that navigation upon such waters is necessarily national in character, and all vessels engaged therein, and all their rights and liabilities are subject to national legislation, without regard to the nature of the trade, whether from port to port within one state, or between the ports of different states; that an enactment in respect

thereof by congress "becomes a part of the maritime law of this country, and therefore it is co-extensive, in its operation, with the whole territorial domain of that law. Norwich Co. v. Wright, 13 Wall. 104, 127; The Lottawanna, 21 Wall. 558, 577; The Scotland, 105 U. S. 24, 29, 31; Providence & N. Y. S. S. Co. v. Hill Manuf'g Co., 109 U. S. 578, 593, 3 Sup. Ct. 379, 617." Butler v. Steamship Co., 130 U. S. 527, 555, 9 Sup. Ct. 612. The opinion of the court by Mr. Justice Bradley in Re Garnett, 141 U. S. 1, 12, 11 Sup. Ct. 840, remarks, in reference to the kindred limited liability act of 1851, that "it is unnecessary to invoke the power given to congress to regulate commerce with foreign nations, and among the several states, in order to pass the law in question." Under these authorities and the further cases of The Daniel Ball, 10 Wall. 557, and Lord v. Steamship Co., 102 U. S. 541, affirming 4 Sawy. 292, Fed. Cas. No. 8,506, which are directly applicable, this legislation is clearly within the national purview.

Regarding this statute as operative, a further question of the measure of liability which would otherwise attach for the special shipments contemplated by this contract does not require consideration, namely, whether the respondent became an insurer of safe delivery, either in the character of common carrier or as incurring kindred obligation (vide The Commander in Chief, 1 Wall. 43, and The Lady Pike, 21 Wall. 1), or whether it was bound only, as bailee for hire, to the use of ordinary care and skill (vide Sumner v. Caswell, 20 Fed. 249; The Dan, 40 Fed. 691; and, in England, in Nugent v. Smith, 1 C. P. Div. 423, 17 Eng. R. 330).

The inquiries established by this statute to relieve the carrier from liability for loss or damage of cargo in transportation for the purposes of the present case are these: (1) Whether the owners show that they exercised due diligence to make the vessel seaworthy, and properly manned, equipped, and supplied; (2) if the loss arose through fault, whether it was fault or error in navigation, or in the management of the vessel. It remains to ascertain from the evidence the answer to these questions, and, further, (3) whether the respondent was negligent in respect to the saving and care of the cargo after the stranding. The conclusions of fact I have reached upon these inquiries will be briefly stated.

1. In fitting out and manning the steamer for performance of the contract, I find that every provision appears to have been made, and every precaution taken, which good seamanship would dictate for this service. The only suggestions against the seaworthiness in fact are that her compasses were defective; that the mate who was navigating the steamer and the men on his watch were either grossly incompetent, or the mate had been overworked, or was under the influence of liquor, and neglected to take the necessary observations. There were two compasses, and all of the direct testimony tends to show their substantial accuracy. Slight deviation is rather the rule than the exception, arising from causes which exist locally about the vessel, and which cannot be exactly defined. It is for this reason that two or more compasses are employed. Constant watchfulness is necessary to note deviations.

Allowance must be made in a course until adjustment can be had, and, after adjustment, neither certainty nor constancy is assured. The circumstances which are charged here as proving substantial error in the compasses are, in my judgment, insufficient, and not borne out by the course actually made. Capt. Davis, produced on behalf of the libelants, testifies that deviation of an eighth of a point (not unusual) would deflect the compass course about three miles in the distance shown here, while the actual deflection in this course is apparently about one mile. Assuming that this slight deviation existed, it cannot be regarded as ground to condemn the vessel as unseaworthy, especially in the absence of any showing of its continuance for sufficient time to require notice. The selection of this mate, and intrusting to him the navigation of the steamer on his watch, were fully warranted by his excellent reputation, long experience as master, and acquaintance with the course taken. In fact, all the men appear to have been peculiarly well qualified, owing to the opportunity afforded for their selection for the special service before the regular opening of navigation. The suggestion that the mate was overworked or under the influence of liquor is unsupported by testimony, and is not entertained. So far as appears in this record, the vessel was seaworthy in fact up to the time of disaster.

2. There is nothing in the state of the weather or the sea which clearly accounts for the stranding, and the only cause which I find fairly presumable from the evidence is this: That the mate, in the absence of necessity therefor, placed too much reliance upon the accuracy of her compass course, and upon a showing of the red light bearing on the reef for warning of its proximity; that he either failed to take and keep accurate observations of the Wind Point flash light, or miscalculated its bearings, when it would have furnished clear and timely warning of the danger of his position had its bearings been noted. This well-known flash light was in clear view for an hour and more, and I am constrained to hold that there was fault in neglecting this warning, and in presuming upon entire accuracy of compass or course, deceptive appearances of distances, or upon the absence of the red light at that hour in the morning when there was, at least, some daylight to dim its appearance. But this was clearly a fault or error in navigation, and not chargeable against the claimants, under this application of the act of congress.

3. After the stranding, the efforts for saving vessel and cargo were adopted with promptness, were carried out with skill, and were successful, except as to a considerable portion of the cargo. In the light of the events, it is possible, and may be probable, that, by earlier resort to pumping and use of extemporized lighters, a larger saving of wheat could have been effected, although there is room for some doubt of these possibilities under the testimony as to wind, sea, and ice. But, as stated in The Nevada, 106 U. S. 154, 1 Sup. Ct. 234, "the event is always a great teacher," and these "possibilities are not the criteria by which they can be judged." The only matter in which it appears to me there was failure by the respondent to exercise the care for the cargo which was demanded under the circumstances as they appeared at the time was in the refusal to

deliver the wheat when demanded at Racine. Aside from this, I find no reasonable ground for complaint, and the question of liability for such refusal is left open for further hearing.

There can be no recovery for the causes set forth in the libel, unless it be for damages above mentioned, and for such allowance in general average as may be just.

NOTE. On March 2, 1896, the supreme court rendered decision in the case of The Delaware, 16 Sup. Ct. 516, in which construction of the Harter act was involved. The opinion is by Mr. Justice Brown, and I regret that it arrived too late for reference in the foregoing opinion, especially for its concise and instructive recital of the history and purposes of the enactment. The pro visions of section 3 are held not applicable to liabilities arising out of collisi with another vessel. It is stated as entirely clear "that the whole object of the act is to modify the relations previously existing between the vessel and the cargo"; that the general words of the third section, "detached from the context, and broadly construed as a separate provision, would be susceptible of the meaning claimed, but when read in connection with the other sections, and with the remainder of section 3, they show conclusively that the liability of a vessel to other vessels with which it may come in contact was not intended to be affected." This interpretation is entirely in accord with the prior rulings in the Second circuit. It does not determine or directly touch upon the question involved in the case of The E. A. Shores, Jr.; and, while it clearly denies a broad construction of the literal terms of the section, the decision, as a whole, supports the view taken in the above opinion,—that the act modifies the relations theretofore existing between the vessel and the cargo, and affects all contracts of affreightment therein, without reaching other existing liabilities of vessel owners.