## THE ALVENA.

### WELSH v. THE ALVENA.

#### (District Court, S. D. New York. April 28, 1896.)

UNSEAWORTHINESS — SUGAR CARGO — CORROSION OF IRON PLATES — CRACKS IN CEMENT—INSUFFICIENT INSPECTION—HARTER ACT.

On a voyage from Jamaica sugar cargo in the aft hold was damaged by sea water coming in through a small hole which was made during the voyage in one of the bottom iron plates of the ship. Examination showed corrosion of the iron plate to a thin edge at the place of the hole, arising from the acid of sugar drainage and sea water, which obtained access to the inside of the plate through cracks in the 6-inch layer of Portland cement. Defendant contended that the cracks, and the consequent access of acid drainage and corrosion, arose from a blow against the outside of the plate during the voyage, and invoked the Carriers' Act of February 13, 1893, as a defence: *Held* (1) upon the facts that the cracks existed at the commencement of the voyage, and that the ship was in that respect unfit for a sugar cargo. (2) That if the Harter Act applied to such a defect, which is doubtful, due diligence in previous inspection was not shown, because the inspection was superficial and insufficient because not such as was likely to discover existing cracks in the cement in that part of the hold. (3) That in default of such inspection, no weight could be given to the mere conjecture of an outside blow as the cause of the injury.

In Admiralty—Damage to sugar cargo.

George A. Black, for libellants.
Wheeler & Cortis, for respondent.

BROWN, District Judge. The above libel was filed to recover for loss and damage to a consignment of 2509 bags of Muscovado Sugar, shipped at Savanilla Mar, Jamaica, on board the steamship Alvena, on the 29th of March, 1895, to be delivered at New York. The sugar was stowed in No. 3 hold aft of the engine-room bulkhead.

The steamship left Kingston, Jamaica, for New York on April 3. At about 1 a. m. of April 8th, water was found rushing into No. 3 hold, coming through a hole in the B strake, the second strake from the keel, on the starboard side of the bottom of the ship, immediately beneath the vertical man-hole entrance to the tunnel. The pumps were not at first able to cope with the influx of water, but after the water from No. 3 was let into the engine room and some jettison of cargo was made, they were able to do so. The vessel put into Norfolk, which she reached about 11 p. m. of the 9th. Temporary repairs were made there, and the vessel reached New York on April ———. A portion of defendant's sugar was damaged by the influx of water. It does not distinctly appear whether any of the plaintiffs' sugar was jettisoned, or not.

The evidence leaves no doubt that the hole in the bottom of the steamer was caused by the corrosive action of the sugar drainage

upon the iron plate of the steamer. This corrosive action is well understood. To prevent it, iron steamers intending to carry sugar cargoes have, as the Alvena in this case had, a layer of Portland cement from five to six inches thick covering the entire bottom where sugar is expected to be stowed. It is necessary that this layer of cement be kept solid and free from cracks. The explanation of this accident, accepted by both sides, is that some crack or break in the cement permitted the sugar drainage to work through it so as to corrode the plate beneath. Examination of the hole showed that the cement was gone in an oval space of about five inches by three at the bottom, and sloping upwards and outwards at an angle of about 60°. The hole in the iron plate was of irregular ovate shape, nearly 2½ inches long, and nearly 1½ inches wide in the widest part. Around the margin of the hole the iron was eaten down to a very thin edge, and the corrosion extended in a less degree all around about ¾ of an inch back from the edge of the hole, at which distance from the edge the plate was again of the normal thickness of about half an inch. The sugar acid, therefore, had eaten out a saucer-like excavation in the plate over an extent of nearly 5 inches in length by about 3 inches in breadth at the widest part. Except in the small space about the hole where the cement was gone, the cement was found to be in good condition. No radiating cracks were observed.

The theory of the libellant is, that the cement over the hole had become cracked or broken from some cause before the voyage began, and that the ship was not properly inspected in that regard and was insufficient for the voyage. The theory of the defendant is, that the crack was caused by a blow during the voyage, on the outside of the iron plate underneath the place of the hole, and that the blow was of sufficient violence to break or crack the cement so as to admit the sugar acid. On the outside of the ship, from a point far forward of the hole, and running a little aft of it, there were indications of a number of recent sharp scratches going through the paint and turning up slight ridges which remained fresh when the ship was examined on the dry dock. There were no indentations in the plate, and no other evidences of any blow upon the outside.

The libellant further contends that the pumps were not in proper condition for effective service when wanted, and that this defect contributed greatly to increase the damages.

The defendant relies chiefly upon the provisions of the Carriers' Act of February 13, 1893, commonly known as the "Harter Act." 2 Supp. Rev. St. p. 81. That act provides that—

"If the owner * * * shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation, or in the management of said vessel."

This act has been supposed to relieve the vessel from the consequences of all latent defects in her construction, where "due diligence" has been used to make her perfect; and in the case of The Millie R. Bohannon, 64 Fed. 883, I stated that understanding of the act. See, also, The Silvia, 15 C. C. A. 362, 68 Fed. 230, 232. The

language of the 3rd section of the Act, however, extends only to "damage or loss resulting from faults or errors in navigation or in the management of the vessel" or "from dangers of the sea"; and it is at least doubtful whether any loss arising solely from a latent defect in the ship and not through any fault, or error of navigation or management, is covered by the act.

The requirement of "due diligence", however, is not satisfied by the mere appointment of competent persons to repair. Due diligence in repair and equipment must be exercised, in fact. The Mary L. Peters, 68 Fed. 919; The Flamborough, 69 Fed. 470. See The Rossmore [1895] 2 Q. B. 408.

There is no question here of latent defects in the structure of the ship, but only of due diligence in inspection, maintenance and repair; and the Harter Act does not establish any new rule of diligence as to either of those subjects. The obligations of due diligence to make the ship seaworthy are in all respects the same as before the Act.

As respects the pumps, it is plain, that if they were not in good order at the commencement of the voyage, the carriers' act would furnish no defence; since such defect must have arisen through lack of due diligence. But if their insufficiency, or lack of readiness at the time they were wanted, arose from causes occurring on the voyage, whether from the prior use of the pumps, or neglect to keep them in working condition, the latter negligence would belong to the management of the ship, and be expressly covered by the Harter Act. The Viola, 59 Fed. 632; Id., 60 Fed. 296; The Silvia, 64 Fed. 607; affirmed 15 C. C. A. 362, 68 Fed. 230.

I do not think it necessary, however, to determine the questions raised as to the condition or sufficiency of the pumps, upon which a good deal of evidence was taken; because I am not satisfied that the ship has proved due diligence in the examination and inspection of the cement bottom, such as to show her to have been in a reasonably fit condition, i. e., seaworthy, for a sugar cargo, at the commencement of the voyage; nor is there any such evidence of a blow or other injury during the voyage as to dispense with the necessity of that proof. It is, indeed, barely possible that the defendants' theory may be true; but the probability seems to me very small. It is not probable that a blow of any considerable violence upon the bottom of the ship could have occurred without its being known to anyone on board; and if it was known, the evidence of it would naturally have been produced. The scratches, whatever may have caused them, do not seem to me to indicate any such blow; nor can I understand how any objects which might make these slight scratches could crack the cement inside, or how any blow would be sufficient to crack the cement inside without leaving some indentations, or some marks upon the plate outside quite different from those scratches. Nor does it seem to me that a cracking of the cement by a blow from the outside would be likely to be confined to so small a spot at the bottom of the cement with no wider extension, or radiating cracks above.

The theory of the defendant seems to me, therefore, merely the theory of a remote possibility. In other words, it is but conjecture only, without evidence of any actual facts to sustain it. That is not enough to dispense with proof of such an inspection of the ship before the commencement of the voyage as the nature of the case admitted and required, in order to insure safe carriage of a sugar cargo.

It is only after proof of due inspection, and the consequent presumption that the ship was sound at the beginning of the voyage, that the mere possibility or conjecture of such an outside blow can be accepted as the probable cause of the damage, rather than previous cracks in the cement. The Edwin I. Morrison, 153 U. S. 199, 213, 14 Sup. Ct. 823; The Emma Johnson, 1 Spr. 527, Fed. Cas. No. 4,465. The proof of inspection of the cement bottom in this case before the commencement of the voyage was of the most general character. The cross-examination showed it was not such as was likely to discover any existing cracks in the cement at the place of this hole, though they might have been plain on actual examination. Full inspection was not impracticable, though inconvenient in that part of the ship; and if the owners chose to make use of that part of the ship for sugar cargo, the inconvenience of careful examination of the bottom could not throw upon the cargo the risk of imperfections in the cement. On the contrary, any such omission was at the ship's risk. The Edwin I. Morrison, ut supra.

The very small place of corrosion where the cement was gone, and the lack of cracks in the cement around it, indicate to my mind the greater probability of a blow from above on the top of the cement. Such a blow would naturally result in a smaller break in the bottom of the cement than at the top, as this break was. Such a blow from the inside upon the top of the cement would not naturally have occurred during the voyage, as the hole was immediately below the vertical manhole into the shaft tunnel, and was underneath the limbers.

The reasonable conclusion, therefore, is that the cracks in the cement had arisen from something occurring before the commencement of this voyage, when the limbers were open; and that the accident arose from the lack of the necessary repair at the time the crack occurred, or of the requisite inspection afterwards. For such faults, the Harter Act, even upon the broadest construction of it, affords no exemption of liability; even though the corrosive action of sugar drainage was one of its "inherent qualities." For the ship was bound to the exercise of "due diligence" before the commencement of the voyage, to prevent the access of drainage to the iron plates.

Decree for libellant, with costs.