BRITISH & FOREIGN MARINE INS. CO. et al. v. KILGOUR S. S. CO., Limited, et al.

(District Court, S. D. New York. December 20, 1910.)

1. INSURANCE (§ 606*)—MARINE INSURANCE—SUBROGATION—ACTION BY CARGO INSURER TO RECOVER SALVAGE PAID.

An insurer of cargo becomes a surety for the faithful performance of the contract of the carrier whether such carrier be a common or special carrier, and where the insurer has paid salvage on behalf of the cargo, made necessary by the fault of the ship, it is no defense to a suit brought to recover the amount from the owner and charterer that under the terms of the insurer's contract he was not bound for the salvage because the ship deviated from her voyage, the construction of the insurer's contract by the parties thereto being a matter with which respondents have no concern, since it is a matter of indifference to them whether their liability is to the shipper or insurer.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1506; Dec. Dig. § 606.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. SHIPPING (§ 121*)—UNSEAWORTHINESS OF VESSEL—LIABILITY OF CHARTERER AS CARRIER—SALVAGE PAID BY CARGO OWNERS.

A steamship line having contracts to carry the season's product of certain Cuban sugar producers chartered a steamer which loaded at Cuban ports and cleared for New York. When she started, it was known to her master that she had insufficient coal for the voyage, and, as it proved, she had insufficient to take her to Newport News, where he intended to go for more, and in consequence he burned some of the sugar, and in attempting to make a North Carolina port stranded and was released and towed to New York by salvors. A part of the salvage was paid by the cargo owners or their insurers, who brought suit to recover the same from the charterer, which brought in the shipowner. *Held*, that the want of sufficient coal rendered the vessel unseaworthy at the commencement of the voyage, and was a breach of the charterer's contract of carriage, whether as a common or special carrier, and that it was liable for the sugar burned and the salvage paid by the insurers.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 449–451; Dec. Dig. § 121.*]

3. SHIPPING (§ 132*)—CHARTER—UNSEAWORTHINESS OF VESSEL—LIABILITY AS BETWEEN OWNER AND CHARTERER.

Evidence considered, and *held* to show that the unseaworthiness of a steamer under charter in sailing on a voyage with cargo with insufficient coal was due to the fault of the master, who concealed the fact from the charterer, for which fault the owner was responsible and liable over to the charterer for the amount recovered against it by the cargo owners and their insurers for losses resulting from such unseaworthiness.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 132.*]

In Admiralty. Suit by the British & Foreign Marine Insurance Company and others against the Kilgour Steamship Company, Limited, and the Munson Steamship Line. Decree for libelants.

Final hearing in Admiralty. Action by cargo owners, and cargo underwriters on steamship Dunkeld to recover (1) for salvage paid by underwriters and earned by releasing Dunkeld and cargo from peril after stranding on coast of North Carolina; and (2) for value of certain cargo used as fuel by the steamship in completing her voyage after salvage service rendered. The Kilgour Company is the owner of the steamship, which was under time charter to Munson Line.

Mr. Kneeland, for libelants.
Mr. Kirlin, for Kilgour Company.
Mr. Haight, for Munson Line.

HOUGH, District Judge. The Dunkeld left Antilla, Cuba, on March 20, 1908, fully laden with a cargo of sugar, which she intended to and did deliver at New York. She had then on board 110 tons of coal, much if not most of it known to be of inferior quality, though not believed to be so bad as was finally proven. Her master and engineer knew that with such weather and currents as were reasonably to be expected New York could not be reached with the contents of her bunkers. It was hoped that Newport News could and would be made, and their intention was to put in and recoal there. The Dunkeld had gone from England to Vera Cruz, and while there had been chartered to Munson, had then gone direct to Puerto Padre, Cuba, and partly loaded, from there to Antilla (less than one day's voyage)

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and finished her cargo. Considering the time of year, the nature of the voyage, the quality of coal, and the average consumption on the journeys last enumerated (as shown by the log), it must be found that to attempt even the trip from Antilla to Newport News with no more than 110 tons was imprudent if not positively dangerous. As matters turned out, although I find in log and master's protest no evidence of weather strange to the North Atlantic in March, the bunkers were so exhausted before reaching Hatteras that it was concluded to put into Portsmouth, N. C. In making this attempt, and because of the drifting and consequent falsity of a buoy shown on chart, the Dunkeld took the ground, was ultimately pulled off by tugs of the Merritt Company, and brought to New York in tow. So exhausted was fuel that 32 bags of sugar (mixed with coal) were burned to give the ship steerage way. On arrival (with cargo otherwise seemingly intact), the Merritt Company asserted a lien for salvage against cargo. Thereupon the underwriters, who had issued the ordinary open policies against marine perils, engaged in writing "to hold ourselves bound to (the Merritt Company) until (that Company) is paid our pro rata proportion of the charges or compensation for the (salvage) services as aforesaid, as soon as the amount of said charges can be properly ascertained." They further agreed to appear on behalf of cargo should legal proceedings be taken. No such proceedings, however, were found necessary, and the underwriters subsequently paid direct to the Merritt Company large sums of money for so much of which as the court may allow this suit (so far as insurers are concerned) is brought, the owner of one lot of cargo joining in respect of his 32 bags of sugar burned as above stated.

It appears from this record that the steamship cleared from Antilla to New York, and that bills of lading were issued for the same voyage, so that nowhere in custom house or shipping documents was any right reserved, nor did any intention appear, of stopping at Newport News or elsewhere for coal or other purposes. It similarly appears that the two shippers whose sugar comprised the Dunkeld's entire cargo had contracts with Munson to carry their season's product, and it is claimed that these contracts were of such nature as to render the Munson Line a special and not a common carrier in respect of the sugar so transported.

From these premises, it is argued that the underwriter libelants have no standing in court, if as matter of law the effort to reach Portsmouth constituted a deviation, because the policies in evidence contain no clause extending insurance to a deviation from the voyage declared, wherefore when libelants paid salvage arising after or on deviation they paid what they were not liable for, became mere volunteers, and cannot assert themselves to be subrogated to the rights of cargo owners. On principle this contention seems ill founded. What is asserted in this cause is breach of a contract of carriage between the Munson Line and certain shippers. Whether as a result of that contract Munson's became a common or special carrier, it is still true that the primary contract is for carriage. An underwriter for cargo owner is but a surety that carrier will fulfill his primary ob-

ligation.  Such a surety may interpret his contract in a manner not approved by the carrier.  He may even interpret it wrongly or act under a mistake of fact, but still he acts always as surety, and it does not lie in the mouth of one who has broken his contract and is liable to his shipper to complain that the underwriter who is asserting that liability and none other cannot prevail solely because of the terms of his suretyship.  Those terms are not the carrier's concern, as soon as it is shown that payment to the underwriter extinguishes the shipper's just demand.  Upon authority The Iron Mountain, 1 Flip. 616, Fed. Cas. No. 270, and cases cited, seems conclusive.

The second argument from the facts last stated is that because Munson was but a special carrier the doctrine of deviation does not apply, and neither the shipper nor any one claiming under him can complain of the Dunkeld's leaving her direct route for coal or any other purpose.  If it were necessary to base decision on deviation, this contention might require consideration, but in my judgment it makes no difference here whether there was a deviation or not, and none whether the carriage relation was common or special.  It is believed to be true that the liabilities of a common carrier grow out of his primary obligation as an insurer, while those of a special carrier rest on the fact that he is a mere bailee.  Decision may and often does rest on presumption; so strong in the case of one inviting all the world to patronize his vehicle or ship, while as against a bailee it is sometimes necessary affirmatively to prove lack of ordinary care.

In this case it is not necessary to hold that even in the instance of a private or bailee carrier by water the warranty of seaworthiness attaches to the vessel proffered as the instrument of carriage (plain as that proposition seems), for if there was unseaworthiness in fact, known before voyage begun, that knowledge when proven constitutes the clearest evidence of lack of ordinary care.  The shippers of the Dunkeld's cargo had a contract with the Munson Line alone.  This action is in personam, and, viewed as a demand against Munson's only, there can be but one result under the authorities.  Charterers let the ship finally depart without what they were bound by charter party to furnish and what they impliedly agreed with their shippers to provide.  On this point it is immaterial whose was the actual negligence at Antilla.  The shippers have a right as against their carrier to at least the exercise of ordinary care toward them.  The fact that the steamer cleared from Antilla without even enough coal to reach the end of the stage contemplated by the master (Newport News) is proof enough.  Hurlbut v. Turnure (D. C.) 76 Fed. 587, affirmed 81 Fed. 208, 26 C. C. A. 335; Thin v. Richards, 2 Q. B. (1892) 141; The Vortigern, Prob. (1899) 140; Greenock S. S. Co. v. Mar. Ins. Co., 9 Com. Cas. 41.  For shippers' purposes it is to be remembered that the master was the charterer's master.

It follows that, had suit been begun against Munson's only, there would be a decree for libelant, but the presence of the shipowner raises another question.

This action not being in rem, it is to be noted that counsel agreed in open court that both charterer and owner were sued in personam on

the request of owner, whose ship was threatened with seizure. The cargo owners have no contract with shipowner, and, whatever might have been their rights against the hull into which their goods were laden, the personal liability of Kilgour Company can only be reached by finding the shipowner liable over to Munson's, and by treating this action as a shorter method of trying the claim of libelants against Munson Company, into which suit the latter had petitioned the shipowner under the equity of the fifty-ninth rule. This may be done under the practice of this court. Evans v. N. Y. & P. S. S. Co. (D. C.) 163 Fed. 405. It follows that the last inquiry raised by this suit is to ascertain as between owner and charterer the responsibility for the proven unseaworthy condition in which the Dunkeld left Antilla. The charter party is in the common form requiring charterer "to provide and pay for all coals," and the fact issue between respondents settles down to this: The Dunkeld's master says he demanded of charterer's representative more coal when he got to Antilla, and was refused it, although the coal was there and could have been gotten; and he was then instructed to sail with his short supply, and put into an American port for more. The charterer while admitting that Puerto Padre afforded no coal asserts that the master said nothing at all about coal at Antilla, and sailed ostensibly for New York without even stating his intention of consuming unnecessary time by putting into Chesapeake Bay, if he got so far on his bunkers. When first considered, both stories seem incredible. Why should any agent refuse coal, or why should any captain neglect to ask for it, with the insistence of a man whose life might depend on its receipt? It is necessary therefore to consider the evidence (1) to note anything unveracious in the captain's story; and (2) to ascertain any motive on either side for taking risks on coal supply when leaving Antilla. The evidence being by deposition, impressions must be drawn from the printed page—a method far inferior to seeing and hearing the men, yet it seems clear to me that the engineer of the Dunkeld (whose knowledge ends at Puerto Padre as he did not go ashore at Antilla) had no great confidence in his captain, for he took his second with him to act as witness when he laid the facts as to coal before the master, while the deposition of the master himself is unpersuasive, and characterized by exaggeration. He attributed much expenditure of coal to "knocking about" Nipe Bay (where Antilla lies), something reduced to trivial unimportance by brief cross-examination. He manifests a feeling against the charterer inexplicable by anything contained in the case, and he makes one assertion for which I can see no justification at all, viz., that, when he left Vera Cruz, he was to go and did go to Havana for orders, which were brought out by small boat off Havana entrance. Yet his log shows nothing of the kind, and he himself finally receded from positive assertion that he did get orders at Havana, while maintaining that, when he left Vera Cruz, he expected to go there. There was no reason for that expectation, the charterer's orders were plain for Puerto Padre, and the exact location of that obscure port was asked for by his owner, and in all probability communicated to him. For these reasons, and by its whole

tone, I am not favorably impressed by the master's deposition; and when motive is looked for there is incentive (though a very poor one) for the ship's doing what was done, and none that I can see for the charterer's agent at Antilla wishing it done. It was one of the terms of the charter party that steamer should arrive at loading port with 100 tons of owner's coal in bunkers. This she did not do, she had but 58, and it was the master's fault that this occurred. If he had gotten coal in Cuba, he must have known that 42 tons of it would have been charged (or sought to be) by charterer against the ship at the high prices actually paid; while, if he could win to Newport News, prices were much lower.

On the whole, it is believed that the Dunkeld's master, even if he did demand coal at Puerto Padre (which is doubted) did not apprise charterer's agent at Antilla of his condition, and took the chance of reaching a cheap fuel market with what he had. If, as is believed, there was a positive concealment of condition by the ship's master, in order to avoid reproof if not heavier discipline for an antecedent breach of charter party, the fault for the Dunkeld's unseaworthiness is placed by the facts on the master in his capacity as shipowner's agent, and his principals must respond for his act.

This renders it unnecessary to rely on MacIvor v. Tate, 1 K. B. (1903) 362, and Park v. Duncan, 25 Sess. Cas. 528, which would make shipowners liable as the result of mere nonaction. Here there was positive wrongdoing.

Libelants may take a decree against both respondents with directions to collect first from Kilgour Steamship Company, any balance remaining uncollected after execution returned (or its equivalent) to be paid by Munson Line, which by payment will become entitled to enforce against Kilgour Steamship Company.

The amount recoverable—i. e., proper salvage award—will be adjusted by a reference.