McWILLIAMS BROS., Inc., v. DAVIS, Director General of Railroads.

JAMES McWILLIAMS BLUE LINE v. SAME.

(Circuit Court of Appeals, Second Circuit. November 13, 1922.)

Nos. 51, 52.

1. Towage ⊛19—Tug held at fault for mooring tow to other moored barges in gale.

A tug *held* at fault for mooring five barges of her tow to other barges moored to a pier, where they were subject to the combined effect of the tide and a northeast gale, without ascertaining that the lines to the piers were sufficiently strong to hold the entire flotilla, as the result of which the flotilla went adrift and damaged some of the barges.

2. Towage ⊛11(10)—Tug masters held bound to take notice of warnings.

Tug masters working about the harbor of New York are bound to take notice of weather warnings and to protect their moored tows accordingly.

3. Towage ⊛14—Notice limiting liability not agreed to does not make an agreement.

A notice by tug owners that thereafter the tugs would not be liable for damages to a tow, but were to be considered as the agents of the tow, to which an owner of the barges subsequently injured as a result of the tug's negligence replied, refusing to accede to the new rule, and declaring that, if the tugs thereafter accepted orders to tow that owner's barges, they would do so on the same terms as theretofore, does not establish an agreement between the parties limiting the liability of the tugs, since there was no meeting of the minds thereon.

4. Towage ⊛11(1)—Tug owner cannot avoid consequences of own negligence by notice not agreed to.

A carrier cannot avoid liability for the consequences of its own negligence by a notice to that effect, unless the relief from liability is agreed to by the terms of the contract of carriage, and this rule applies to the

---

⊛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

liability of a tug owner for its negligence in the care of a barge intrusted to the tug for towing.

Appeals from the District Court of the United States for the Eastern District of New York.

Separate libels in admiralty by McWilliams Bros., Incorporated, and by the James McWilliams Blue Line against James C. Davis, Director General of Railroads (Pennsylvania Railroad), as Agent. Decree for libelant in each case (273 Fed. 622), and respondent appeals. Affirmed.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Charles E. Wythe, both of New York City, of counsel), for appellant.

Leo J. Curren, of New York City (Leo J. Curren and Eli J. Blair, both of New York City, of counsel), for appellees.

Pierre M. Brown, of New York City, for New York Boat Owners' Ass'n, amicus curiæ.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. The appellee McWilliams Bros., Inc., was the owner of the barge Yankee and the appellee James McWilliams Blue Line was the owner of the barges Blue Girl and W. H. Elliot. The Blue Girl and the Elliot were laden with coal and were moored inside the slip between the piers referred to at the trial as the "mooring pier" and the "Barge Canal terminal pier" at Newtown creek. They were fastened to one another and fastened to other boats in the slip. The slips were adjacent and the boats were moored abreast at the ends of the piers.

On February 4, 1920, in the evening at 6:30 p. m., the Overbrook, owned by the appellant, with 10 loaded coal boats in tow, arrived at Newtown creek from Jersey City. The Yankee was the starboard hawser boat in tow. The Overbrook rounded to and made her tow fast to the end of the canal terminal pier, to the stern of the boats already moored there. After this landing, the Overbrook took in her hawsers, went back and pushed in the head pier, and her deckhand went over and assisted the captain of the boats in making fast. She then proceeded to single out some of the boats and to tow them to various destinations. There was a strong northeast wind of gale force, which steadily increased throughout the day, and a very heavy snowfall of about 5½ inches. The Overbrook made four trips to and from Newtown creek, and finally, after finishing her work, left there at about 9:50 p. m.

The tow was made fast outside of a large number of barges which had previously assembled about the second pier to the southward of Newtown creek, known as the mooring pier. On removing the vessels which she distributed along the East River, the Overbrook did not return to the five vessels she left at Newtown creek. The tide was ebb at about 11 p. m., and about midnight 14 vessels, including the five which had been in the Overbrook tow, broke away as one large flotilla and drifted down the East River under the influence of the ebb tide

and the wind. The Yankee was damaged to such an extent that she sank. The Blue Girl hit a plank when off Jay street and sustained damages. The Elliot, which cast off her anchor after the boats went adrift, in an effort to stop, lost her anchor and chain. After the boats were fastened, the following diagram illustrates how they were moored and tied:

The solid line surrounds the five boats which the Overbrook had in tow, and the broken line surrounds the boats which went adrift in one flotilla.

[1] The lines from the Lehigh 33 to the end of the pier parted, and the 7 loaded boats swung off from the pier end and hung to the boats at the mouth of the slip by the line from the Lehigh 33 to the Crystal. The heavy strain and the drag of these boats in this strong ebb tide and the northeast wind was more than the lines of the Elliot could withstand, and they parted. It was the overtaxing of the lines that caused the parting, and the weight of the whole flotilla being cast on the 8-inch line from the Blue Girl to the state barge pier, caused it to snap, with the result that the 14 boats went adrift. This situation is much the same as that presented in Pennsylvania v. McWilliams Towing Line, 277 Fed. 798, where this court said:

"* * * The James McWilliams arrived at Newtown creek, having in tow a canal boat with a cargo of about 300 tons, with which she hung up to the flotilla already moored there. She then went further up the creek for the purpose of picking up other boats to make up a new tow. * * * The James McWilliams * * * hung up the canal boat outside of the flotilla moored at this old pier at Newtown creek, just before the flotilla broke away. If it was this that caused the drifting, the appellant is liable. The May McGuirl, 256 Fed. 20, 167 C. C. A. 292. It was the duty of the tug master to look after the lines when additional weight was put on the moored tow. The

drifting of the flotilla under the circumstances presumptively established neglect on the part of the appellant, and we think the evidence offered in behalf of the appellant does not overcome this presumption of negligence."

The moored boats had safely remained in the position they were in for 12 hours to 2 days previously without difficulty, and it was the additional strain placed upon the lines by tying up the tow of the Overbrook that caused them to part. There was plenty of room up the creek, and it was not necessary for the appellant's tug master to place his tow where he did. It was held to be negligent for a tug master to fail to foresee and to guard against a line slipping over the top pile, which would be likely on the rising tide. In re Ganoga, 257 Fed. 720, 169 C. C. A. 8. Where a barge went adrift, and the bargeman, to save himself, caught on some boats moored at the pier, with the result that the additional strain parted the lines to the pier, it was held that the barge, whose captain brought this about, was liable, although the court considered that it was the natural thing to try to guard against damage by tying to said barges. The Walter Green (C. C. A.) 266 Fed. 260. Where barges broke loose from their fastenings, and were driven before the gale and into collision with an anchored vessel, and damaged, it was held that the tug having the scows in charge was solely liable, because she had so disposed the tow that the head lines of one of the scows were required to bear the strain of all three of them, and the tug herself without adequate additional fastening. The P. I. Nevius, 67 Fed. 158, 14 C. C. A. 355.

[2] The Overbrook had ample time to look to the lines, if they were not practicable and unsafe to use. Further than that, if the place at hand was not safe, she had no right to leave her tow unprotected. The appellant's servant in charge of the tug had his attention directed to the fact that he was placing the tow in an exposed place, and was requested to select another place to tie up the tow; it appearing that there was room up the creek on the other side of the Barge Canal pier. It was the combination of the strong ebb tide and a northeast wind which the pilot of the Overbrook should have considered in mooring his barges. The tug masters working about the harbor are bound to take notice of warnings and protect their tows accordingly. Nicholson v. Erie R. R., 255 Fed. 54, 166 C. C. A. 382; Doherty v. Penn. R. R. (C. C. A.) 269 Fed. 959.

But the appellant in the suit of McWilliams Bros., Inc., asserts his nonliability because of a notice which was sent out to barge owners on September 2, 1918, which reads as follows:

"United States Railroad Administration. W. G. McAdoo, Director General of Railroads, Pennsylvania Railroad, Eastern Lines. Office, Foot Cortlandt St.

"New York, N. Y., Sept. 2, 1918.

"Gentlemen: We beg to inform you that it has become necessary for us to cease being responsible for vessels while in tow of our tugs. On and after September 11, 1918, the following conditions will apply to all work accepted and performed by tugs owned, employed or chartered by the Pennsylvania Railroad Company: All towing is done at the risk of the tow. Neither we nor the tugs employed in the service nor the owners shall be responsible for any damage done to the tow through negligence and the masters and

crews of tugs, in the performance of the towage service shall become the servants of and identified with the vessel or the craft towed, whether singly or with other vessels owned by you in the possession of charterers, and to the shifting of vessels in and around piers and in slips.

"Very truly yours,        D. C. Chase, Sup't Steam Towing."

This was a general notice to the trade and was sent to all owners of barges in the harbor. McWilliams Bros., Inc., replied as follows:

"McWilliams Bros., Inc., Towing and Transportation, No. 1 Broadway.

"New York, September 6, 1918.

"Mr. D. C. Chase, Sup't Steam Towing, Pennsylvania R.. R., Cortlandt Street, N. Y.—Dear Sir: We beg to acknowledge the receipt of your letter of the 2d inst. in reference to the nonresponsibility of your tugs for damage in towing boats by your company, even through negligence. We will not accept your terms as stated in your letter, but we reserve the right to continue to report our boats for towing to your company under the same conditions that have previously prevailed in reference to the responsibility for damage, and if you accept the orders to tow our boats, you do so on the same terms and conditions that have heretofore prevailed.

"Yours very truly,        McWilliams Bros., Inc.,
"DE.TH        By D. Eberle."

[3] The contract to tow the Yankee was made a year and a half later. No such letter was sent to the appellee James McWilliams Blue Line. The letter in question is therefore applicable only in so far as the claim of McWilliams Bros., Inc., for the loss of the Yankee is concerned. We think the District Court properly held that, in view of the letter in reply, no agreement was made by the appellee exempting the appellant from liability for its own negligence. There was no meeting of the minds and no agreement of the parties accepting this nonliability for negligence.

[4] In the case of Ten Eyck v. Director General of Railroads (C. C. A.) 267 Fed. 974, the question presented was whether the terms which the Director General sought to impose were contrary to public policy, and it was held that by implication the terms had been accepted and the court held that they were not so repugnant to public policy that the Director General, where they were accepted, could not avail himself of the defense. A carrier cannot, by notice, avoid the responsibility of the consequence of his own negligence, unless the relief is agreed to by the terms of the contract of carriage. Without an actual meeting of the minds constituting a contract, a tug owner cannot avoid the consequences of this negligence in the care of a barge intrusted to him for towing. In La Compania Bilbaina v. Spanish American Co., 146 U. S. 483, 13 Sup. Ct. 143, 36 L. Ed. 1054, there was a tentative charter party planned by agents of the owner and the charterer, and signed with the understanding that some clauses were subject to the owner's approval. The charterers asserted that they would not accept the charter party unless the owner approved of these clauses. The owner subsequently notified the charterers that he disapproved of these clauses. It was held that the owner did not ratify the charter party signed by his agent, although no objections to particular clauses thereof were made, and the charter party therefore never became effective.

We think that there was no error below in holding that the parties did not agree to relieve from responsibility by the letters exchanged.

Decree affirmed.