## TICE TOWING LINE v. JAMES McWILLIAMS BLUE LINE et al.

District Court, S. D. New York.
Jan. 29, 1931.

244

Park, Mattison & Lynch, of New York City (Anthony V. Lynch, of New York City, of counsel), for libelant.

Leo J. Curren, of New York City, for James McWilliams Blue Line.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Norman M. Barron, both of New York City, of counsel), for Director General of Railroads.

WOOLSEY, District Judge.

I overrule the first exception to the Commissioner's report and confirm the amount of the salvage fixed by him for barges and cargo at $1,000.

I sustain the second and third exceptions to the Commissioner's report.

The result of these rulings is that the libelant may have a decree providing for an award of $1,000 recoverable primarily against the Director General and secondarily against the James McWilliams Blue Line.

I. This libel for salvage is the sequel of other litigations in which the Director General was held for negligent mooring at Newtown Creek on February 4, 1920, of the coal laden barges Blue Girl and W. H. Elliott while under contract to tow them within the port of New York. James McWilliams Blue Line v. Davis, Director General (D. C.) 273 F. 622, affirmed 285 F. 312 (C. C. A.). It now comes before me on exceptions to the report of Earle Farwell, Esq., as Commissioner. His report has been printed in full in 1930 American Maritime Cases at page 1834 and, consequently, it is unnecessary to refer to it except incidentally.

II. Judge A. N. Hand, in a short opinion,[1] dated December 30, 1924, held the Director General primarily liable to the salvor for the award and referred the case to a Commissioner to find the value of the cargo salved.

He said:

"This is a libel against the respondent for salvage services in the rescue of two barges with their cargoes in the East River. The latter brings in the Director General of Railroads upon the theory that the negligent operation of a tug by the agents of the latter occasioned the necessity for the salvage service, and that the Director General should accordingly bear any loss to the respondent occasioned thereby. The Director General pleads res adjudicata because in former action damages were recovered against him by the respondent for injury to its barges. It is argued on behalf of the Director General that any salvage for which the respondent might be made liable here should have been included as damages in the former action. The Director General also pleads the two year Statute of Limitations provided in the Salvage Act.

"In the case of British & Foreign Marine Ins. Co. v. Kilgour S. S. Co. [D. C.] 184 F. 174, Judge Hough held that the amount for which a libelant might be held liable for salvage could be added to the damages recovered by such libelant in a suit by it against a third party for negligence where the salvage services became necessary owing to such negligence.

"As a matter of fact no attempt was made in the former litigation (which is referred to

---

[1] Here quoted in full.

here under the plea of res adjudicata) to recover anticipated salvage payments as one of the items of damage. The salvors were not a party to that litigation and, therefore, cannot be bound.

"Unless the salvage has been paid,—certainly unless it had been completely adjusted with the salvors,—it could not be treated as an item of damage without an adjudication by which they were bound as parties. Here there has been clear prima facie proof of salvage services. An attempt is made by bringing in the Director General under the Fifty-sixth Rule to hold him liable for the payment of salvage services occasioned by his negligence which he has never paid and which he could not have been compelled to pay in the state of the pleadings in the former action. I think the plea of res adjudicata must therefore be overruled, and the Director General held liable unless the Statute of Limitations is a bar. But the Director General is not liable for salvage; he is only liable to indemnify the person whose property was salved for losses occasioned by the negligence of a tug which the government was then operating. This cause of action would not accrue until the primary liability was in some way established. The Statute of Limitations had therefore not run at the time the Director General was brought in under the Fifty-sixth Rule.

"Inasmuch as sufficient testimony as to the value of the cargo has not been introduced, I shall only direct an interlocutory decree for the libellant, under which the Director General shall be primarily, and the Mc-Williams Blue Line secondarily liable, referring the question of the amount of salvage to be awarded to Pierre M. Brown, Esq."

Earle Farwell, Esq., the Commissioner, who was substituted for Pierre M. Brown, Esq., originally appointed in pursuance of this opinion, found as the salved values involved, which were admitted or agreed, the following:

| | |
|---|---|
| Blue Girl | $12,000. |
| W. H. Elliott | 3,500. |
| Vessels' salved total | $15,500.00 |
| Blue Girl Cargo | $7,363.25 |
| W. H. Elliott Cargo | 6,822.38 |
| Cargoes salved total | $14,185.63 |

The Commissioner fixed $1,000 as the total award for the salvage of these values and allocated the proportion thereof to be assessed as salvage award against the barges alone as $522, to which amount he limited the libelant's total recovery.

The three exceptions filed by the salvor to the Commissioner's report and now before me may be summarized as follows:

First. That the amount awarded libelant is inadequate.

Second and Third. That the award was limited to the proportion chargeable against the barges—the salved vessels—only, and excluded any award for services rendered to the cargoes thereof.

■ Having regard to the circumstances of the weather on the night of the salvage, cf. McWilliams v. Davis (C. C. A.) 285 F. 312 at pages 314–315, and the promptness and skill of the service, I agree with the Commissioner that $1,000 is a proper award for the total salvage. I also agree that, proportionately assessed, $522 is a fair proportion of the award to be assessed against the barges alone. I do not agree, however, that this amount is all that is recoverable by the libelant herein.

III. The question of importance in this case, therefore, arises, not out of the amount at which the award was fixed, but out of the respective liabilities for cargo's proportion thereof as between the carrying barges and their negligent bailee tug.

■ It should be observed in this connection that, as Judge Augustus Hand held, there cannot be a direct claim for salvage against the Director General, operator of the negligent bailee tug, because the salvage suit was not brought within two years of the salvage service as required by the provisions of the Salvage Act of August 1, 1912. Title 46, U. S. C., § 730 (46 USCA § 730). That is the law of this case.

Thus the liability of the Director General is by way of indemnity only under Admiralty Rule 56 (28 USCA § 723).

Such being the practice situation, it must next be determined what decree should be rendered in the exercise of the substantive equity which is one of the characteristic attributes of admiralty courts.

IV. The situation is this:

A sues B, a barge owner, on a cause of action for salvage which has arisen against B and in favor of A owing to the fault and neglect of C, the operator of a bailee tug.

B impleads C as indemnitor for any amount which may be found due from him for the salvage service.

The cargoes on B's barges are not before the court.

■ Under settled principles, C, as operator of the bailee tug, is liable for negligence causing damage to her tow, including salvage required to be paid by the tow as a consequence of such negligence. British & Foreign Marine Ins. Co. v. Kilgour S. S. Co. (D. C.) 184 F. 174.

The question here is whether the absence of cargo on B's barges should reduce A's recovery against B proportionately, and, consequently, reduce the amount for which C is liable over to B.

This question is of first rate interest and importance, and its proper decision requires some consideration of the authorities here and in England.

■ V. I hold, under the authorities hereinafter cited, that a salvor is entitled to a salvage award as against any one whom he may have benefited by successful salvage services.

The problem in this case is to determine —in the absence of the cargo—whether any party before the court was benefited by the salvage of the cargo, and, if so, which party was benefited and in what way.

■ The barges were private carriers and the relationship of the owners of the coal cargoes to the barges and the owner thereof was that of bailor and bailee.

If the coal cargoes had been lost or damaged and the owner of the barges had been sued for such loss or damage, it could not have defended by alleging and proving that the loss or damage was due to the negligence of the tug which it had engaged to help it perform its contract to carry the cargoes. Taylor Bros. Lumber Co., Inc., v. Sunset Lighterage Co. et al., 43 F.(2d) 700, 702 (C. C. A. 2); The Moran No. 10 (D. C.) 41 F. (2d) 255, 256; Schoonmaker Conners Co. v. Lambert Transp. Co., 268 F. 102, 104 (C. C. A. 2), and cases there cited. And see, also, The Harper No. 145, 42 F.(2d) 161, 164 (C. C. A. 2).

Nor could the owner of the barges have claimed freedom from liability to their cargoes under section 3 of the Harter Act, title 46 U. S. C., § 192 (46 USCA § 192), on the ground that the loss was due to negligent management or navigation by the tug.

There are two reasons for this:

■ First. Because the Harter Act does not apply to private carriers such as these barges. The G. R. Crowe, 294 F. 506, 508 (C. C. A.

2), affirming Judge Ward's decision in the District Court for this district, 287 F. 426.

■ Second. Because the Harter Act does not apply to the carriage of cargo wholly within the same port—in this case the Port of New York—but applies so far as domestic commerce is concerned only to carriage of cargo "to and from," i. e., between different ports in the United States. Cf. Sacramento Navigation Co. v. Salz, 273 U. S. 326, 332, 47 S. Ct. 368, 71 L. Ed. 663; The Hugh O'Donnell (D. C.) 22 F.(2d) 410; The Nettie Quill (D. C.) 124 F. 667, 669; In re Piper Aden Goodall Co. (D. C.) 86 F. 670, 671; The E. A. Shores, Jr. (D. C.) 73 F. 342, 347.

Consequently the salvage service rendered by the libelant relieved the barge owner in this case from the risk of the liability to which it could have been held if the coal cargoes had been lost or damaged.

■ VI. A claim for salvage may be maintained in personam against any party whose relationship to the vessel or thing salved is such that he might have been liable in respect of its damage or loss, Duncan v. The Dundee Perth and London Shipping Co., Scotch Session Cases, vol. V, 4th Series, 742; The Five Steel Barges, 15 Prob. Div. 142, 146, 6 Asp. Mar. Cas. 580, 582; The Port Victor, 9 Asp. Mar. Cas. 163, 165, 166, affirmed 9 Asp. Mar. Cas. 182, 183, or who, though not its owner, is benefited by its being salved, as was the case where the salving of cargo gave the United States an opportunity to impose customs duties on it. United States v. Cornell Steamboat Co., 202 U. S. 184, 26 S. Ct. 648, 50 L. Ed. 987; Id., 137 F. 455 (C. C. A. 2), in which the principles of the British cases just cited were discussed and approved.

And see, also, for another and earlier enforcement of this principle by Judge Benedict, Seaman v. Erie R. R. Co., 21 Fed. Cas. pages 918, 920, No. 12582 decided in 1868.

Duncan v. The Dundee Perth and London S. S. Co., Scotch Session Cases, vol. V, 4th Series, page 742, the earliest British case in which the principle under discussion seems to have been involved, was decided in 1878. In that case a British vessel, which was running coastwise as a common carrier with a general cargo, was salved. The necessity for her salvage arose from the actionable negligence of her master. The salvors sued her owner alone in personam without joining any of the cargo or any of the cargo owners.

The Lord President, Inglis, said at page 748: "The case, then, stands in this position:

The master of a vessel received into his possession, as a carrier, a great variety of goods, to be carried from Dundee to London, belonging to a very great number of different owners altogether unconnected with one another. If he had lost these goods he and his owners would have been answerable for the value. The salvors saved not only his ship but saved these goods, and enabled him, as turned out afterwards, and his owners, to trans-ship these goods at Dundee into another vessel belonging to the company, and in that vessel to carry them to London and deliver them at their destination. What would have been the consequence to the master and the owners, and to the owners particularly, if the pursuer, instead of allowing trans-shipment to take place, had laid an embargo on these goods, and said 'No, these goods shall not leave Dundee until my claim is satisfied, or security is found to satisfy it.' I cannot conceive a more inconvenient or oppressive proceeding on the part of salvors than that would have been. And it is said that the salvors have lost really all opportunity of making good their claim because they failed to follow that very inconvenient and oppressive procedure.. I cannot listen to that allegation."

Lord Shand said at page 751: "The case then comes to this, that the carrier of these goods being absolutely bound to deliver them at the end of the voyage, the salvage has directly enured to his benefit, for it has enabled him to fulfil his contract and to earn the freight which he charged for these goods. On the ground that it is established in this case as matter of fact that the benefit of this salvage, in so far as regarded the cargo, enured directly to the carrier, I am of opinion that he is liable for the salvage which is here claimed."

In The Five Steel Barges, 15 Prob. Div. 142, a case which arose in 1890, the President, Sir James Hannen, without having had the Scotch case called to his attention, said at page 146: "As to the two (barges) which have been given up to the Government, I think it is perfectly clear on the authorities that an action in personam lies against the owners of a vessel which has been saved, even though the property has been transferred to others, and the lien lost. In this case, however, the property does not appear to have been in the defendant, because it would, I think, under the contract, to which reference has been made, be in the Government. But on this point I am of opinion that the right to sue in personam is not confined to the case

of the defendant being the actual legal owner of the property saved. I think it exists in cases where the defendant has an interest in the property saved, which interest has been saved by the fact that the property is brought into a position of security. The jurisdiction which the Court exercises in salvage cases is of a peculiarly equitable character. The right to salvage may arise out of an actual contract; but it does not necessarily do so. It is a legal liability arising out of the fact that property has been saved, that the owner of the property who has had the benefit of it shall make remuneration to those who have conferred the benefit upon him, notwithstanding that he has not entered into any contract on the subject. I think that proposition equally applies to the man who has had a benefit arising out of the saving of the property. In this case the defendants were under contract with the Government to supply them with barges at a certain price. Payment was to be made by certain instalments, of which only one remained unpaid at the time of the services. I think, if Mr. Barnes' argument is well founded—viz., that those instalments were all paid on condition that the barges should be delivered all within twelve months of the date of the contract—it would follow that, if defendants had not been in a position to deliver the barges within the twelve months, then either they would have been liable in damages for not performing the contract, or liable to make restitution of the instalments which had been paid them on conditions not fulfilled by them. It appears to me, therefore, that they had substantially an interest to the full amount of the barges at the time of the services, and that the same moral obligation to which the law has given force in the case of an owner applies to those who have an interest in the property. That is certainly the business-like view of the matter; and I do not forget that the defendants insured themselves to the full value of these barges, and described themselves as being the owners. In conclusion, I award £200 as salvage, independently of the towage contract."

In The Port Victor, 9 Asp. Mar. Cas. 165, decided in 1901, government stores were being carried at the risk of the charterers of the Port Victor, and these stores were saved from a danger for which the charterers were legally responsible. It was held that the charterers were liable to pay salvage, and that there was a personal liability to do so quite apart from the liability of the res.

One of the greatest admiralty judges of the last generation, Sir Francis Jeune, then

president of the Probate and Admiralty Division, referred to the case of The Five Steel Barges, decided by Sir James Hannen, and also to the Scotch case of Duncan v. Dundee Shipping Co., and, after quoting from the decisions in both cases, said at page 566:

"It was argued before me that the present case can be distinguished from that of The Five Steel Barges on the ground that in that case the defendants had a lien for the price of the barges, and so, for practical purposes, were the owners, although the property in law was no doubt in the Government. It was contended that the claim for salvage is limited to claims against the owners, or at least against the persons who, like carriers, are in possession of the goods at the time of the salvage, but that in the present case the defendants were not the owners of the goods, nor were ever in possession of them. A legal foundation for this review was sought in the argument that the Admiralty action in personam is based on the supposition that the goods were allowed by the salvors to be returned to their former possessor on the terms that he should be liable to pay the salvage reward. I think that this contention is based on too narrow a view of the right of a salvor, and, in my opinion, the nature and origin of the Admiralty action for salvage do not impose any limits on that right narrower than those indicated by Lord Hannen and Lord Shand in the cases I have mentioned.
* * *

"The true view is, I think, that the law of Admiralty imposes on the owners of property saved an obligation to pay the person who saves it simply because, in the view of that system of law, it is just he should, and this conception of justice naturally imposes a proportionate obligation on any person whose interest in the property is real, though falling short of that of ownership. I see no reason, therefore, why I should not follow the view of Lord Hannen and of the Scotch Court of Session, that a man who has had a benefit arising out of the saving of the property is liable to a claim for salvage no less than the actual owner of it."

The case then went to the Court of Appeal, The Port Victor, 9 Asp. Mar. Cas. (N. S.) 182. That court consisted of Lord Alverstone, Lord Chief Justice, Smith, Master of the Rolls, and Romer, L. J.—a very strong Court—and Sir Francis Jeune's decision was affirmed unanimously. The view of the Court of Appeal was shortly and most emphatically stated in an opinion by the Master of the Rolls, at page 184: "We are asked to overrule the President of the Admiralty Division on a point as to which he has, no doubt, special knowledge, and we are asked to reverse the authority of Sir James Hannen, who of all men was a man of peculiar knowledge on that point—namely, as to whether an action in personam for salvage was properly brought in the Admiralty Court. The judgment of Sir James Hannen in The Five Steel Barges was delivered in 1890, after the judgment of the Scotch Court of Session in Duncan v. Dundee, Perth and London Shipping Company, and curiously enough the Scotch case was not brought to the attention of Sir James Hannen when he decided the case of The Five Steel Barges. Therefore, we have, independently of each other, four Scotch judges and afterwards Sir James Hannen spontaneously arriving at the same conclusion. Now we are asked in the year 1901 to say that all of those five learned judges were wrong in what they decided in those cases. I myself am prepared to rest my judgment upon the judgment of Sir James Hannen, and I will say this, that having read this judgment through twice during the argument of this case, I consider it is founded upon common sense. A clearer judgment was never delivered by any learned judge, and I refuse to say it is wrong. I think this appeal ought to be dismissed."

The principles laid down in the cases just discussed have not only been approved by the Circuit Court of Appeals for this circuit in United States v. Cornell Steamboat Company, 137 F. 455, 459, 460 (1905), but have been adopted as the law by the Supreme Court of the United States in the appeal of that case, United States v. Cornell Steamboat Company, 202 U. S. 184, 26 S. Ct. 648, 50 L. Ed. 987, which was decided in 1906.

In that case a tug owned by the Cornell Steamboat Company had saved a certain lot of sugar in bags on board the lighter Bangor in New York harbor from the imminent risk of being destroyed by fire. Duties in the sum of $6,000 were saved to the United States by this service.

The Supreme Court affirmed the decision of the Circuit Court of Appeals holding the United States liable for salvage. Mr. Justice Brown, one of the most experienced of admiralty judges, in writing the opinion of the court, dealt with the cases which I have cited thus (202 U. S. at pages 193–195, 26 S. Ct. 648, 651, 50 L. Ed. 987):

"The case of Five Steel Barges, L. R. 15 Prob. Div. 142, is authority for the proposition that the remedy in personam is not confined to the legal owner of the property saved, but extends to one who has a direct pecuniary interest in such property. This was an action against five barges, two of which belonged to the government, with whom the defendants were under contract to build and deliver the barges. An action in rem was brought against the three barges, and an action in personam against the defendants, who had contracted with the government and given it possession of the two barges. The court sustained the action in personam thinking it 'perfectly clear that an action in personam lies against the owners of a vessel which has been saved, even though the property has been transferred to others and the lien lost.' Continuing, the president of the court, Sir James Hannen, observed: 'I think it exists in cases where the defendant has an interest in the property saved, which interest has been saved by the fact that the property is brought into a position of security. The jurisdiction which the court exercises in salvage cases is of a peculiarly equitable character. The right to salvage may arise out of an actual contract, but it does not necessarily do so. It is a legal liability arising out of the fact that property has been saved; that the owner of the property, who has had the benefit of it, shall make remuneration to those who have conferred the benefit upon him, notwithstanding that he has not entered into any contract on the subject. I think that proposition equally applies to the man who has had a benefit arising out of the saving of the property.' This last sentence is particularly applicable to this case.

"In the subsequent case of The Port Victor, 9 Asp. Mar. L. Cas. 163, the same court decided that where government stores were being carried at the risk of charterers, these charterers were liable to pay salvage in a personam action, apart from the liability of the stores in rem. The case was decided largely upon the authority of Five Steel Barges and Duncan v. Dundee, P. & L. Shipping Co., 5 Sc. Sess. Cas. 4th Series, p. 742, and was affirmed by the court of appeals in an opinion by Lord Alverstone (9 Asp. Mar. L. Cas. 182), in which great deference was shown to the decision of Sir James Hannen. See also Carver, Carriage by Sea, § 324a.

"Although courts of admiralty have no general equity jurisdiction, and cannot afford equitable relief in a direct proceeding for that purpose, they may apply equitable principles to subjects within their jurisdiction, and, in the distribution of proceeds in their possession or under their control, may give effect to equitable claims. 2 Parsons, Shipping, 344. Bearing in mind that the duties in this case had been actually collected, were in the hands of the government, and had been saved to it by the exertion of the salvors, who had been awarded salvage for saving the sugar upon which the duties had been collected, a strong case is presented for the allowance of salvage, which should not be lost sight of in determining the principles applicable to the situation."

So far as the Director General, as operator of the negligent bailee tug, is concerned, what has just been said above would apply to him if he were open now to a direct suit for salvage, but, as time has precluded such a suit, he must be remitted entirely to his position as indemnitor of the barge owner through whom alone he can now be reached.

VII. The tug and tow were in effect one vessel. Sacramento Navigation Co. v. Salz, 273 U. S. 326, 332, 47 S. Ct. 368, 71 L. Ed. 663; The Columbia, 73 F. 226 (C. C. A. 9); The Hugh O'Donnell (D. C.) 22 F. (2d) 410; The Bathgate (D. C.) 19 F. (2d) 663, affirmed 25 F. (2d) 103, 104 (C. C. A. 3).

Negligence of the tug which put the cargoes and the barges in jeopardy was similar in its legal effect to actionable negligence for which any shipowner who was a private carrier would be responsible.

The next point to consider, therefore, is the incidence of a salvage award when the necessity for the salvage arises from an actionable breach of the shipowner's duty to cargo.

VIII. Perhaps the leading work on salvage is "The Law of Civil Salvage" by the late Lord Justice Kennedy, formerly of the English Court of Appeal.

In the second edition of that book, on page 207, this proposition, which is universally recognized as sound salvage law, is laid down: " * * * The shipowner cannot look to the cargo-owner for any contribution to the salvage where the occasion for the salvage service has arisen through a breach of contract or duty on the part of the shipowner himself, or of those for whose conduct he is responsible"—citing The Ettrick, 6 Prob. 127; Strang, Steel & Co. v. Scott, 14 App. Cas. 601, 608; Schloss v. Heriot, 14 C. B. N. S. 59.

The author further says, at page 208: "If the owner of cargo has been compelled to pay

the salvor for services which have been rendered necessary by a breach of contract or duty on the part of the shipowner or his servants, he is entitled to be indemnified by the shipowner in respect of this expenditure. In The Princess Royal, the facts alleged were that that vessel had been improperly injured, and then improperly abandoned at sea by her master; and the plaintiffs, the assignees of the bill of lading for goods on board of her, had been obliged, in order to get possession of their goods, to pay the amount of remuneration due to the persons who had salved her. They then proceeded in rem against The Princess Royal (1870 L. R. 3 A. & E. 27, 41) in the Admiralty Court (under the 24 Vict. c. 10, s. 6), to recover the amount of the payment, as well as damages for delay of delivery, and Sir Robert Phillimore held that the action was maintainable."

Again the author says, at page 210: "In salvage, the cargo is primarily, and equally with the ship, liable for payment of the award. The shipowner who pays the cargo's share of it, is clearly entitled to reimbursement, unless, the need for the salvage having arisen from his actionable wrong, the owner of cargo has a good defense, under the rule of avoiding circuity of action."

The rule thus laid down in Kennedy on Civil Salvage, is also to be found in Carver on Carriage by Sea (7th Ed.) § 354, page 502, where it is said:

"But where the salvage services became requisite in consequence of fault on the part of the ship, the shipowner cannot claim contribution from the owner of the cargo (The Ettrick (1881) 6 P. D. 127; The Cargo ex Capella (1867) L. R. 1 & A. & E. 356), notwithstanding that he may have satisfied his full liability to damages for negligence, by taking proceedings for limiting his liability, and paying £8 a ton into Court (The Princess Royal (1870) L. R. 3 A. & E. 27, 41)."

"And where the cargo owners have been compelled to pay salvage in consequence of improper acts of the master, e. g., a wrongful abandonment of the ship, they may claim repayment from the shipowner, and may proceed in rem against the ship for the amount (The Princess Royal (1870) L. R. 3 A. & E. 27, 41)."

In The Loyal (D. C.) 198 F. 591, Judge Holt said, at page 592: "The Apollinaris Company, the owner of the cargo, claims that, if any recovery for salvage is had, it should be had against the F. W. Jarvis Company, on the ground that the vessel was unseaworthy. I think that that claim is correct."

Judge Holt held that, inasmuch as the Jarvis Company could not limit its liability, it should be liable for the full salvage.

The Circuit Court of Appeals affirmed this decision, The Loyal (1913) 204 F. 930, in an opinion written by Judge Noyes, who said at page 931:

"That the lighter 'Loyal' was unseaworthy seems established beyond question. She sprang a leak without having been subjected to any sea peril. The only inference in such circumstances is of unseaworthiness. Besides, the history of the vessel leads to the same conclusion.

"The owner of the lighter was under obligation to the owner of the cargo to assume any salvage award caused by unseaworthiness of its vessel. The vessel-owner had a written contract with the cargo-owner for lighterage services covering an extended period. This lighterage contract implied an obligation that the lighters to be furnished under it should be seaworthy and if this one were in fact unseaworthy (as we have found she was) and if the unseaworthiness made the salvage services necessary (as it unquestionably did) the salvage award ran properly against the vessel-owner subject to any right to limit its liability."

The case of The Lackawanna (D. C.) 220 F. 1000, is also interesting in this connection.

There suit was brought for salvage against a steamship by a wrecking company which had got her off the strand, and it was held that, while in general ship and cargo must proportionately bear salvage expenses where there is a common peril, yet, where salvage services are rendered necessary by the ship's negligence or unseaworthiness, the cargo may be relieved from contribution and the vessel bound for the entire expense.

Judge Hazel said at page 1002: "It is asserted that the salvage services in their entirety were made necessary by the fact that the steering gear of the Lackawanna was defective, as a result of which she came into collision with the barge Chieftain. The Circuit Court of Appeals has sustained this view. The Lackawanna, 210 F. 262, 127 C. C. A. 80. Although, generally speaking, the ship and cargo must proportionately bear the salvage expenses where there is a common peril, yet, where the salvage services are rendered necessary by the ship's negligence, the cargo

may be relieved from contribution and the vessel bound for the entire expense. International Navigation Co. v. Atlantic Mutual Ins. Co., supra [(D. C.) 100 F. 304]; The Irrawaddy, 171 U. S. 187, 18 S. Ct. 831, 43 L. Ed. 130. The employment of the tug James A. Reid by the master of the Lackawanna to assist in floating her was an employment for salvage services, and no doubt gave rise to a maritime lien on the ship. If the salvors had elected to proceed against both the vessel and cargo, and had recovered against them both, the cargo, in my opinion, because of the unseaworthiness of the vessel or her negligent navigation, could have recovered from the vessel the amount for which it was held liable to the claimant. The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794; Strang, Steel & Co. v. Scott, 14 App. Cas. 601."

The libelant should not, therefore, because cargo is not before the court, have his recovery cut down in favor of a negligent bailee barge owner when that bailee is before the court, and as between himself and cargo would be liable for the salvage of the cargo if cargo also were there.

As noted above, the direct liability for salvage of the Director General is precluded by the provisions of the Salvage Act of August 1, 1912 (46 USCA §§ 727–731), but direct liability for salvage is not sought here. Liability is sought against the Director General and was imposed by Judge Hand by way of indemnity only for damages incurred by the barge owner owing to the liability for a salvage service which was rendered necessary by the negligence of the Director General. For as operator of the railroad tug he was bailee, appointed by the owner of the barges, of both the barges and their cargoes, and as such liable for negligence. Doherty v. Penn. R. R. Co., 269 F. 959, 962 (C. C. A. 2); The Wyomissing (D. C.) 51 F.(2d) 242, 1929 A. M. C. 1575; The Drifter and The White City (D. C.) 35 F.(2d) 1006, 1007.

Vis-à-vis the owner of the cargoes, therefore, the Director General as operator of the railroad tug was bailee of a bailee. His negligence has already been adjudicated, McWilliams Blue Line v. Davis (C. C. A.) 285 F. 312, and he has been held liable for damages in respect thereof and is now liable for this salvage as a hitherto unrecoverable part of those damages.

IX. The recovery in an admiralty suit may be imposed as justice requires in whole or in part and primarily or secondarily on the several parties. Cf. Dailey v. City of

New York (D. C.) 119 F. 1005; The Sarnia, 261 F. 900 (C. C. A. 2).

Here I think it is clearly just that the libelant's recovery should be payable primarily by the Director General because in his capacity as operator of the bailee tug in charge of the salved property he gave occasion for the salvage services.

McWilliams Blue Line, though primarily liable for the salvage as such, is entitled to indemnity from the Director General. The decree should, therefore, provide that the libelant's claim shall be first payable by the Director General, and, after remedies against him are exhausted, by the McWilliams Blue Line.

X. A final decree may be submitted in accordance herewith giving costs on the libel to the libelant, payable primarily by the Director General and secondarily by the James McWilliams Blue Line. The James McWilliams Blue Line may have the costs as petitioner under the 56th Rule (28 USCA § 723) against the Director General.

Unless its form is agreed, this decree may be settled on three days' notice.